In the Matter of the Care and Treatment of Mark A. MURRELL, Appellant,

v.

STATE of Missouri, Respondent.

No. SC 87804.

Supreme Court of Missouri, En Banc.

Feb. 13, 2007.

Rehearing Denied March 20, 2007.

Emmett D. Queener, Office of Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., James H. Klahr, Asst. Atty. Gen., Jefferson City, for Respondent.

WILLIAM RAY PRICE, JR., Judge.

A jury unanimously found Mark Murrell to be a sexually violent predator ("SVP") pursuant to sections 632.480–632.513[1], RSMo Supp.2001. Because his appeal challenges the validity of sections 632.480–632.513, jurisdiction lies solely in this Court. Mo. Const. art. V, sec. 3.

This Court holds: (1) that Missouri's SVP statute, sections 632.480–632.513, complies with the due process protections of the United States and Missouri constitutions; (2) antisocial personality disorder ("ASPD") can meet the definition of "mental abnormality" within the meaning of section 632.480(2) if there is evidence of a link between ASPD and sexually violent behavior and there was sufficient evidence in this case for the jury to find that Murrell is an SVP under the statute; and (3) expert testimony, including evidence of ac-

---

1. All statutory references are to RSMo 2000, unless otherwise indicated.

tuarial instruments, was properly admissible in this case because the actuarial instruments utilized constituted facts or data of a type reasonably relied upon by experts in the field that were otherwise reasonably reliable and it was linked with an independent clinical evaluation of Murrell. The judgment is affirmed.[2]

## I. Facts

■ Mark "Red" Murrell has a long record of criminal offenses and has spent the majority of his life in prisons, halfway houses, mental institutions and other detention facilities.[3] As a teenager, he was arrested several times and ended up at a home for boys. By the age of 15 years, Murrell had been in two different boys' juvenile facilities and had an extensive arrest record. He frequently used drugs and alcohol.

When Murrell was 18 years old, he was involved in a bar fight in Kansas that culminated in Murrell stabbing another man. He was arrested on charges of aggravated battery. Three months after that arrest and while out on conditional release, Murrell and two other men abducted two women at gunpoint from a parking lot. They took the women to a Belton house and raped them. On October 23, 1980, Murrell pled guilty to the rape of the two women and to aggravated battery in connection with the stabbing. He was sentenced to 15 years for the rape and 10 years for aggravated battery, to be served concurrently.

Murrell was paroled in 1991. Five months later, while under parole supervision, he was arrested for driving while intoxicated, unlawful use of a weapon, and possession of a controlled substance, cocaine base. On the basis of these charges and the subsequent convictions following guilty pleas, Murrell's parole was revoked and he was sentenced to four years imprisonment. In 1994, he was paroled to a halfway house. He escaped and was soon after apprehended in a drug house. His parole was revoked.

Murrell was finally released from prison and any and all supervision in 1995 and went to live with an ex-girlfriend. In March 1996, four months after his release from prison, Murrell fondled the breasts of a 13–year–old girl while he watched a movie with her and his ex-girlfriend's daughter in the house where he was living. He pled guilty to child molestation in the 2nd degree and was sentenced to four years in prison.

Murrell served four years and was scheduled for release from prison on April 4, 2000. In January 2000, the department of corrections notified the attorney general that Murrell might meet the definition of an SVP. In February of that year the prosecutor's review committee met pursuant to section 632.493, RSMo Supp.1999, and determined Murrell did in fact meet that definition. On February 28, 2000, the State of Missouri filed a petition to commit Murrell to the custody of the department of mental health pursuant to section 632.492, RSMo Supp.1999.

Prior to trial, Dr. Deborah Gunnin, a licensed forensic psychologist with the department of mental health, was assigned to

---

2. Two companion cases, involving several of the issues presented here, *In the Matter of the Care and Treatment of Stephen Elliott v. State* (No. SC87746), 215 S.W.3d 88 (2007) and *In the Matter of the Care and Treatment of Timothy S. Donaldson*, 214 S.W.3d 331 (2007), are also decided this date.

3. This Court reviews the facts in the light most favorable to the verdict. *State v. Gill*, 167 S.W.3d 184, 187 (Mo. banc 2005).

conduct an SVP evaluation of Murrell and diagnosed Murrell with recurrent depressive disorder, polysubstance dependence, and ASPD. In Dr. Gunnin's opinion, the existence of ASPD, as well as Murrell's scores on the Static–99 and MnSOST–R [4] actuarials, made Murrell more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility.

During the pendency of Murrell's SVP proceeding, the United States Supreme Court decided *Kansas v. Crane*, 534 U.S. 407, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002), and this Court, in turn, decided *In the Matter of the Care and Treatment of Thomas v. State*, 74 S.W.3d 789 (Mo. banc 2002). The rule of those cases is that an SVP statute allowing for civil commitment must require a finding of future dangerousness and a link between that finding and the existence of a "mental abnormality" or "personality disorder" that causes the individual serious difficulty controlling his behavior. *See Thomas*, 74 S.W.3d at 791.

Following the change in the law, Dr. Gunnin reevaluated Murrell in October 2002. Although she again diagnosed him with ASPD and again took his scores on the Static–99 and MnSOST–R into account, she believed that there was inconclusive evidence to indicate whether Murrell has control of his behavior and chooses to act unlawfully, or whether he has serious difficulty controlling his behavior.

Consequently, the State hired Dr. Harry Hoberman, also a licensed psychologist, to conduct an evaluation of Mark Murrell. At trial, Dr. Hoberman testified [5] that Murrell suffers from the mental abnormality of ASPD. He instructed that Murrell's

ASPD was a congenital or acquired condition that affects his emotional or volitional capacity such that it predisposes him to commit sexually violent offenses. Finally, Dr. Hoberman testified that, in his opinion, Murrell's ASPD causes him serious difficulty controlling his behavior and makes him more likely than not to engage in future acts of predatory sexual violence. He explained that he measured Murrell's risk of reoffense by reviewing and relying upon Murrell's extensive record, looking to base rates, and using actuarial tools.

Murrell attacked the reliability of the actuarial instruments relied on by Dr. Hoberman. Murrell also called Dr. Gregory Sisk, a licensed psychologist, who stated that in his opinion, Murrell does not suffer from a mental abnormality within the meaning of section 632.480(2). According to Sisk, "mental abnormality," as used in the statute, necessarily requires an abnormality that causes a tendency to commit sexually violent offenses and neither ASPD nor major depressive disorder nor polysubstance dependence necessarily cause sexual urges, as a paraphilia would.

At the conclusion of the evidence the court gave the jury the following verdict director, in relevant part:

> If you find and believe from the evidence beyond a reasonable doubt:
>
>> First, that the respondent pleaded guilty to child molestation in the second degree in the Circuit Court of Jackson County, State of Missouri, on December 10, 1996, and
>>
>> Second, that the offense for which the respondent was convicted was a sexually violent offense, and

4. Minnesota Sex Offender Screening Tool, Revised.

5. Because Murrell refused to be interviewed, Dr. Hoberman relied upon his review of the

available police records, court records, medical records, victims' statements, Department of Correction files, and probation and parole reports.

Third, that the respondent suffers from a mental abnormality, and

Fourth, that this mental abnormality makes the respondent more likely than not to engage in predatory acts of sexual violence if he is not confined to a secure facility, then you will find that the respondent is a sexually violent predator.[6]

The jury unanimously found Mark Murrell to be a sexually violent predator. The court entered judgment on the verdict and ordered Murrell to be placed in the custody of the Missouri Department of Mental Health for control, treatment and care until his mental condition has so changed that he is safe to be at large.

## II. Discussion

### A. Points on Appeal

Murrell raises four points of error on appeal: (1) the trial court erred when it denied his motion to dismiss the State's petition because sections 632.480–632.513 violate due process; (2) the evidence was insufficient to prove beyond a reasonable doubt that Murrell is an SVP; (3) the trial court erred in admitting evidence that Murrell suffers from ASPD because it is not a "mental abnormality" under the statute; and (4) the trial court erred in admitting the results of Murrell's scores on the Static–99 and MnSOST–R actuarial instruments as applied to him by Dr. Hoberman.

### B. Constitutionality of Sections 632.480–632.513

Murrell alleges that the trial court erred when it denied his motion to dismiss the State's petition because sections 632.480–632.513 are unconstitutional in that they permit civil commitment of an individual without requiring proof that the individual's mental abnormality makes him more likely than not to commit a sexually violent offense in the immediate future. Rather, he urges, the statutes allow commitment based on a finding that a person may be a danger at some indefinite time into the future and will commit a sexually violent offense over the course of an entire lifetime and are, therefore, unconstitutional.

### 1. Standard of Review

■■■ This Court reviews issues of law *de novo. Barker v. Barker*, 98 S.W.3d 532, 534 (Mo. banc 2003). "Statutes are presumed to be constitutional." *Suffian v. Usher*, 19 S.W.3d 130, 134 (Mo. banc 2000) (citations omitted). This Court will "resolve all doubt in favor of the act's validity" and may "make every reasonable intendment to sustain the constitutionality of the statute." *Westin Crown Plaza Hotel v. King*, 664 S.W.2d 2, 5 (Mo. banc 1984). If a statutory provision can be interpreted in two ways, one constitutional and the other not constitutional, the constitutional construction shall be adopted. *See Asbury v. Lombardi*, 846 S.W.2d 196, 199 (Mo. banc 1993).

### 2. Due Process Standards

The Missouri General Assembly has identified sexually violent predators as a very real threat to the safety of the people of Missouri. As a result, if a previously convicted sexually violent offender is found to have a mental abnormality making him

---

**6.** The instruction also included the following definitions: "As used in this instruction, 'sexually violent offense' includes the offense of child molestation in the second degree. As used in this instruction, 'mental abnormality' means a congenial or acquired condition affecting the emotional or volitional capacity that predisposes the person to commit sexually violent offenses in a degree that causes the individual serious difficulty controlling his behavior. As used in this instruction, 'predatory' means acts directed towards individuals, including family members, for the primary purpose of victimization."

dangerous at the time of scheduled release, sections 632.480 et. seq. establish the process pursuant to which he or she may be civilly committed.[7] Section 632.480 defines "mental abnormality" and "sexually violent predator" as follows:

> **"Mental abnormality"**, a congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others[.]

> . . .

> **"Sexually violent predator"**, any person who suffers from a mental abnormality which makes the person more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility.[8]

Sec. 632.480(2), 632.480(5).

Pursuant to its police power, a state may enact SVP statutes providing for the involuntary civil commitment of dangerous persons "provided the commitment

7. Under Missouri's SVP statute, the attorney general's office receives notification at least 360 days prior to the scheduled release of a individual previously convicted of a sexually violent offense. *See* secs. 632.480–632.513. Upon receipt of notification, the attorney general may initiate preliminary proceedings to determine whether the individual meets the definition of "sexually violent predator." *See id.* If such a determination is made, the attorney general may file a petition containing the allegation in the probate division of the circuit court that convicted the individual. Sec. 632.486. The judge shall then make a determination as to whether probable cause exists to believe the individual is an SVP, and if such a determination is made the individual has the right to a hearing at which they are entitled to be represented by counsel and to present evidence and cross-examine witnesses. Sec. 632.489. If a probable cause determination is made following the hearing, the individual shall be transferred to a secure facility for an evaluation as to whether he or she is a sexually violent predator. *Id.* Within 60 days of the completion of the examination the court shall conduct a trial to determine whether the individual is an SVP; the individual, the attorney general, or the judge may demand the case be tried to a jury. Sec. 632.492. The court, or jury as it may be, shall determine whether, by clear and convincing evidence, the individual is an SVP. Sec. 632.495.1, RSMo Supp.2006. If the individual is found to be an SVP, he or she shall be committed to the custody of the director of the department of mental health for control, care and treatment until such time as the individual's mental abnormality has so changed that he or she is safe to be at large.

Sec. 632.495.2. Any person committed pursuant to the statute shall have a current examination of that person's mental condition made once every year by the director of the department of mental health or designee, and the yearly report shall be provided to the court that committed the person. Sec. 632.498.2. The individual may petition for conditional release; if the director agrees, the individual may be released. *Id.* If the individual petitions for conditional release over the director's objection, the petition shall be served on the court that committed the individual, there shall be a hearing, and if the court determines by a preponderance of the evidence that the individual no longer suffers from a mental abnormality making them more likely than not to commit sexually violent offenses, the court shall set a date for trial on the issue. Secs. 632.498.3 and 632.498.4. The burden is again on the attorney general to prove by clear and convincing evidence that the individual's mental abnormality remains. Sec. 632.498.5(3). If the court or jury finds the mental abnormality no longer remains, the person shall be conditionally released; otherwise, the person shall remain in the custody of the department of mental health until fit for release. Sec. 632.498.5(4).

8. The statute also requires the person to have "pled guilty or been found guilty, or been found not guilty by reason of mental disease or defect pursuant to section 552.030, RSMo, of a sexually violent offense;" or to have "been committed as a criminal sexual psychopath pursuant to section 632.475 and statutes in effect before August 13, 1980." Sec. 632.480.

takes place pursuant to proper procedures and evidentiary standards." *Kansas v. Hendricks*, 521 U.S. 346, 357, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997); *see also Foucha v. Louisiana*, 504 U.S. 71, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992). The Supreme Court in *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), held that a finding of "mental illness" alone will not justify locking up a person against his will for an indefinite period of time. *Id.* at 575, 95 S.Ct. 2486. Rather, due process requires that a person be both mentally ill and dangerous in order to be civilly committed; the absence of either characteristic renders involuntary civil confinement unconstitutional. *Foucha*, 504 U.S. at 77, 112 S.Ct. 1780. *See also Hendricks*, 521 U.S. at 358, 117 S.Ct. 2072. The individual must not only be dangerous at the time of, but also during, commitment, for "if his involuntary confinement was initially permissible, it could not constitutionally continue after a basis no longer existed." *O'Connor*, 422 U.S. at 575, 95 S.Ct. 2486.

■■■ Moreover, due process requires that the "mental abnormality" and "dangerousness" be inextricably intertwined, such that "involuntary civil confinement [is limited] to those who suffer from a volitional impairment rendering them dangerous beyond their control." *Hendricks*, 521 U.S. at 358, 117 S.Ct. 2072. The result being, as found in *Thomas*, that to pass constitutional muster the statute must require a finding of future dangerousness and then link that finding to the existence of a "mental abnormality" or "personality disorder" that causes the individual serious difficulty controlling his behavior. *See Thomas*, 74 S.W.3d at 791–92; *see also Hendricks*, 521 U.S. at 358, 117 S.Ct. 2072;

*Kansas v. Crane*, 534 U.S. at 413, 122 S.Ct. 867.

### 3. Due Process Challenges

■■■ Murrell contends that "future dangerousness" requires a showing that the individual poses an imminent, immediate threat of harm. Essentially, Murrell's argument is that due process requires proof that an individual will commit a sexually violent offense at a specific time. This precise issue need not be considered. As noted by the Supreme Court of California in *Hubbart v. Superior Court*, 19 Cal.4th 1138, 81 Cal.Rptr.2d 492, 969 P.2d 584 (1999), "nothing in *Hendricks* or the cases on which it relied suggests that a commitment scheme must require the trier of fact to pinpoint the time at which future injury is likely to occur if the person is not confined." 81 Cal.Rptr.2d 492, 969 P.2d at 600. Murrell is dangerous at the time of commitment precisely because he currently presents a danger of committing a sexually violent offense.

The language of section 632.480 is written in the present tense and necessarily requires the jury to find an individual *presently* poses a danger to society if released. Under the plain language of the statute, a person may not be confined absent a finding he *"suffers "* from a mental abnormality that *"makes "* the person more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility. Sec. 632.480(5). In order to be found to suffer from a mental abnormality, a person must have a condition *"affecting "* the congenital or volitional capacity that *"predisposes "* the person to commit a sexually violent offense in a degree constituting such person a *"menace "* [9] to health and safety of others. *Id.*

---

**9.** A "menace" is by definition a present danger: "threatening import, character, aspect; someone that represents a threat; impending evil." Webster's Third New International Dictionary, Unabridged, 1981.

Missouri's SVP statute requires a finding that, to be committed, the individual 1) has a history of past sexually violent behavior; 2) a mental abnormality; and 3) the abnormality creates a danger to others if the person is not incapacitated. That is all *Hendricks* requires. *See Hendricks*, 521 U.S. at 357, 117 S.Ct. 2072. It is neither possible nor constitutionally required that the jury be charged with determining at what precise time Murrell's present dangerousness will result in sexually violent behavior. *See Hubbart*, 81 Cal. Rptr.2d 492, 969 P.2d at 600. Because the statute can be construed in a constitutional manner, it need not be invalidated for any alleged lack of specificity and need not be read to require any additional or different constitutional requirements. *See Kearney Special Road Dist. v. County of Clay*, 863 S.W.2d 841, 842 (Mo. banc 1993); *Asbury*, 846 S.W.2d at 199.

■■■■■■ In addition, Missouri's statutory scheme provides for an annual examination of the committed individual's mental health condition. Sec. 632.498.1. Following the procedures set forth in the statute, if the director, the judge, or a jury finds that the individual no longer suffers from a mental abnormality that makes him more likely than not to engage in predatory acts of sexual violence, he shall be conditionally released. Sec. 632.498.5(4). Indeed, commitment pursuant to the SVP statute is not necessarily indefinite, nor a life sentence. "[T]he confinement's duration is instead linked to the stated purposes of the commitment, namely, to hold the person until his mental abnormality no longer causes him to be a threat to others." *Hendricks*, 521 U.S. at 363, 117 S.Ct. 2072. The annual review mechanism ensures involuntary confinement that was initially permissible will not continue after the basis for it no longer exists. *O'Connor*, 422 U.S. at 575, 95 S.Ct. 2486. It is, of course,

hoped that the committed individual responds to treatment so that he is no longer a threat.

The present tense language and annual review mechanism allow Missouri's SVP statute to comport with the due process protections of the United States Constitution, and Murrell has failed to present any authority to suggest the Missouri Constitution provides any greater protection relating to the civil confinement of repeat sexual offenders. The Court's decision today is in accord with the decisions reached by courts in other states that have considered this issue. *Martin v. Reinstein*, 195 Ariz. 293, 987 P.2d 779, 800 (App.1999) (statute required more than a mere possibility, in that "it specifically requires that an accused SVP have a mental disorder that renders him 'likely' to engage in acts of sexual violence ... [and][w]e have defined 'likely' as probable rather than merely possible"); *Hubbart*, 19 Cal.4th 1138, 81 Cal.Rptr.2d 492, 969 P.2d 584, 599 (1999), (statute upheld because "the statutory criteria are expressed in the present tense, indicating that each must exist at the time the verdict is rendered"); *In re the Detention of Selby*, 710 N.W.2d 249, 252 (Iowa App.2005) (statute upheld because the "present tense language of chapter 229A requires that a person be found to be both dangerous and to have a mental abnormality at the time of the proposed commitment ... and [it] provides for a yearly review of the individual's condition"); *Beasley v. Molett*, 95 S.W.3d 590, 600 (Tex. App.-Beaumont 2002) (declaring that by definition a "menace" is a threat or imminent danger and that therefore, in its own terms, the act satisfied any proof requirement of an imminent risk of future harm).

## C. Antisocial Personality Disorder As a Basis for Civil Commitment

Murrell's next two arguments are essentially the same: the State may not be

permitted to commit Murrell because ASPD is not, in and of itself, sufficient to distinguish a sexually violent predator subject to civil commitment from an ordinary criminal better dealt with through the criminal justice system. However, he approaches the issue in two distinct ways.

### 1. Standard of Review

■ The first issue presented is whether ASPD is a "mental abnormality." Questions of statutory construction are strictly a matter of law and are for the independent judgment of this Court. *City of St. Joseph v. Village of Country Club*, 163 S.W.3d 905, 907 (Mo. banc 2005).

■ The second issue presented, whether ASPD may provide sufficient evidence from which the jury may find an individual is more likely than not to engage in predatory acts of sexual violence, is an evidentiary issue. The Court views the evidence in a light most favorable to the jury verdict, disregarding all contrary evidence and inferences, and determines whether the evidence was sufficient for twelve reasonable jurors to have believed beyond a reasonable doubt that Murrell is an SVP. *Care and Treatment of Cokes v. State*, 183 S.W.3d 281, 282 (Mo.App. 2005).[10]

### 2. Murrell as Distinguished From the Typical Recidivist

#### i. *ASPD and "Mental Abnormality" Under Section 632.480*

■ Murrell's first argument is focused on the statutory definition of "men-

tal abnormality." He asserts that the statute requires a mental abnormality that is, in and of itself, linked to sexual offending. Consequently, he argues ASPD cannot, constitutionally, be used to form the basis of civil commitment, evidence of the disorder should not have been admitted, and he cannot be found to fall within the definition of an SVP.

■ The Court held that under *Kansas v. Crane*, 534 U.S. 407, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002), the "degree" to which a person cannot control his behavior must be "serious difficulty." *In the Matter of the Care and Treatment of Thomas v. State*, 74 S.W.3d 789, 791 (Mo. banc 2002). Under section 632.480 and *Crane*, "mental abnormality" is (1) a congenital or acquired condition; (2) affecting the emotional or volitional capacity; (3) that predisposes the person to commit sexually violent offenses; (4) in a degree that causes the individual serious difficulty controlling his behavior.[11] *See id.* at 792.

Murrell's argument that the SVP statute requires a mental abnormality that, in and of itself, predisposes a person to commit sexually violent offenses fails. Missouri's SVP statute need only require "evidence of past sexually violent behavior and a present mental condition that creates a likelihood of such conduct in the future if the person is not incapacitated." *Kansas v. Hendricks*, 521 U.S. 346, 357–358, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997). Civil commitment statutes have been upheld "when they have coupled proof of danger-

---

**10.** Under the version of Missouri's SVP statute in effect at the time Murrell was committed, the evidentiary standard was the same as the standard in criminal cases. Section 632.495, RSMo Supp.1999. As a result, "[appellate] review of the sufficiency of the evidence applies the same standard of review as in criminal cases." *Care and Treatment of Cokes*, 183 S.W.3d at 282.

**11.** Although Murrell does not contest whether ASPD (1) qualifies as a congenital or acquired condition; (2) affects the emotional or volitional capacity; or (4) causes him serious difficulty controlling his behavior, the record reflects that those elements were, in fact, established.

ousness with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality.'" *Id.* at 358, 117 S.Ct. 2072. "Mental abnormality," as used in *Hendricks,* includes personality disorders. *See id.* ("The recommitment requirement of a 'mental abnormality' or 'personality disorder' is consistent with the requirements of these other statutes that we have upheld in that it narrows the class of persons eligible for confinement to those who are unable to control their dangerousness.").

 Murrell is correct insofar as he argues that a diagnosis of ASPD, based upon a criminal history devoid of any sexual crimes, cannot, standing alone, satisfy the statutory definition of an SVP; that evidence would only satisfy the "mental condition" aspect. Murrell is also correct to the extent he argues sexually deviant disorders such as sadism and pedophilia, which are mental abnormalities necessarily involving a propensity to commit sexual offenses, satisfy the statutory definition standing alone. Simply because ASPD cannot in every case be enough, however, does not make it "too imprecise." If ASPD is linked with sexually violent behavior, it can provide the basis for commitment.

### ii. ASPD and "Sexually Violent Predator"

 Murrell's second argument that ASPD does not distinguish him from the common criminal is focused on the definition of "sexually violent predator." He argues that even if ASPD is a mental abnormality, it provides insufficient evidence to support a finding that he is more likely than not to engage in predatory acts of sexual violence in the future if not confined. Again, while Murrell is correct that ASPD is not, in and of itself, sufficient to provide a basis for a finding that an individual is more likely than not to engage in

predatory acts of sexual violence if not confined, ASPD will be sufficient when combined with other evidence of sexually violent behavior.

There was evidence of sexually violent behavior in this case. The jury heard from both Dr. Hoberman and Dr. Gunnin that ASPD predisposes Murrell to commit sexually violent offenses. They heard testimony of Murrell's past sexually violent crimes. On one occasion, Murrell raped two women. Prior to the rape, one of the victims asked to use the bathroom. Murrell followed her and before she could pull her pants back up he put his arm around her, rubbed her on her thighs and in between her legs while holding a knife to her, and made her grab his penis.

The second victim testified that after they arrived at a house Murrell ordered them to remove their clothes while holding his shotgun, and he and the other men "took turns" with them. Specifically, she told the jury that Murrell raped her several times vaginally and orally, and made her perform oral sex on him. While she was being raped, he told her he would kill her if she told anyone, and he grabbed her hair and smacked her head on the floor.

The jury heard accounts of the sexual molestation of a 13–year–old girl. Dr. Hoberman noted that although Murrell tried to wait until he was alone with the girl to fondle her, he did it in a house in which his ex-girlfriend was present, and the girl's friend did, in fact, see the incident occur. When Murrell fondled the young girl's breasts under her bra, she asked him to stop, but he continued to fondle her breasts over her bra and shirt.

The jury heard two experts in this case, Drs. Gunnin and Hoberman, testify that based on their clinical evaluations and on actuarial instruments, they believed Murrell's ASPD makes it more likely than not

he will engage in sexually violent behavior in the future if not confined. Dr. Hoberman testified that the actuarial tools he used put Murrell in the "high risk" category for reoffense. He stated that Murrell refuses, at times, to take the medication that helps him control his behavior and that he has had aggressive outbursts in prison at least twice in 2004. The evidence showed that Murrell has never completed a drug treatment or sex offender treatment program. Murrell himself indicated that when depressed he feels like someone else takes over him and endorsed the statement, "behaviors occur due to instinct and you have no control over them." Dr. Hoberman's opinion was based in part on the fact that Murrell has been free, collectively, for only a little over a year since he was 18 and in that time has committed multiple sexual offenses, each involving more than one act of assault. While on conditional release after his arrest for stabbing a man, Murrell abducted two women at gunpoint and repeatedly raped them. When Murrell was released after his incarceration for rape, he molested a 13–year–old child only 4 months later.

### 3. Conclusion

Antisocial personality disorder qualifies as a mental abnormality within the meaning of section 632.480, as interpreted by *Thomas,* if it is linked to past sexually violent behavior. ASPD will provide the evidentiary basis for a finding that a person is an SVP if there is also evidence that the individual is more likely than not to engage in predatory acts of sexual violence in the future if not confined. Murrell has committed sex crimes in two instances, each involving multiple acts of assault, one with multiple victims. Murrell committed the sex crimes impulsively, with little hesitation and without thinking about the consequences of his actions. The evidence showed that in the past he has exhibited no remorse or regret for those crimes.

There was sufficient evidence in this case of the link between ASPD and sexually violent behavior for the jury to find Murrell is an SVP under the statute and distinguishable from the typical recidivist. To borrow language from *Hendricks,* Murrell's "lack of volitional control, coupled with a prediction of future dangerousness, adequately distinguishes [Murrell] from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings." *Hendricks,* 521 U.S. at 360, 117 S.Ct. 2072. This Court's holding on this point is in accord with previous decisions of all three districts of the court of appeals of this state. *See In the Matter of the Care and Treatment of Heikes v. State,* 170 S.W.3d 482, 486 (Mo.App.2005) (holding "a personality disorder can constitute a mental abnormality if all of the statutory elements are met"); *In re Shafer,* 171 S.W.3d 768, 771–72 (Mo.App.2005) (affirming commitment of sex offender with ASPD); *In the Matter of the Care and Treatment of Pate,* 137 S.W.3d 492, 497 (Mo.App.2004) (holding narcissistic personality disorder with antisocial features qualifies as a mental abnormality).

### D. Admissibility of the Actuarial Instruments

■ Although relatively new in the judicial context, the actuarial method of risk assessment has been used rather extensively in other settings. E. Janus & R. Prenky, *Forensic Use of Actuarial Risk Assessment with Sex Offenders: Accuracy, Admissibility, and Accountability,* 40 Am. Crim. L.Rev. 1443, 1454 (2003). Dr. Hoberman explained the methodology of both actuarial instruments in this case. He testified that the Static–99 is a ten-item measure developed by looking at the character-

istics of approximately 4,000 sex offenders to see which characteristics they possessed were associated with the likelihood of reoffense within 15 years, as defined by reconviction.[12] The items that make up the Static–99 include prior sex offenses as measured by arrest or conviction, history of general violence, the number of prior sentencing occasions, marital status, and characteristics of the victim such as sex and whether the victim was a stranger.

Dr. Hoberman explained that the MnSOST–R is a sixteen-item measure developed by looking at the characteristics of approximately 1,000 individuals to see what characteristics were highly correlated to rearrest for sexual offenses within six years of release. The items include whether the victim was a stranger, the age of the victims, whether force was used, employment history of the offender, the offender's drug use at or around the time of offense, age of the offender, whether the offender has completed chemical dependency or sex offender treatment, and whether the offender had any disciplinary offenses during his or her most recent incarceration.

When Dr. Hoberman applied the Static–99 to Murrell he found that, according to the instrument, a person with Murrell's characteristics falls into the high risk category for reoffense. The score Murrell received is associated with a 52 percent

chance of reconviction within fifteen years. Dr. Hoberman stated that the MnSOST–R, as applied by him to Murrell, placed Murrell in the high risk category for reoffense. According to Dr. Hoberman, the most recent research indicates that individuals in the high risk category of the MnSOST–R have a 72 percent chance of being rearrested for a sex offense within six years.

Murrell argues that the trial court abused its discretion in admitting Dr. Hoberman's testimony as to the results of the Static–99 and MnSOST–R actuarial instruments. Specifically, he argues that the instruments reflect only the results of a group analysis and, therefore, are irrelevant and not helpful to the jury in that they do not address the issue of whether Murrell is likely to reoffend.

### 1. Standard of Review

 The determination of whether to admit evidence is within the sound discretion of the trial court. A trial court will be found to have abused its discretion when a ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *State v. Johns*, 34 S.W.3d 93, 111 (Mo. banc 2000). This Court's direct appeal review is for prejudice, not mere error, and the trial

12. More specifically, "actuarial scales are developed using statistical analyses of groups of individuals (in the present case, released sex offenders) with known outcomes during a 'follow-up' period (either arrested for or convicted of a new sexual offense, or not identified as having committed a new sexual offense). These analyses tell us which items ('predictor variables') do the best job of differentiating between those who reoffended and those who did not reoffend within a specified time period. Since some of these variables inevitably do a better job than others, these analyses also help us to determine how much weight should be assigned to each item. The variables are then combined to form a scale, which is tested on many other groups of offenders (cross-validation). When the scale has been used on many samples with a sufficiently large number of offenders, the scores derived from the scale may be expressed as estimates of the probability that individuals with that score will reoffend within a specified time frame." E. Janus & R. Prenky, *Forensic Use of Actuarial Risk Assessment with Sex Offenders: Accuracy, Admissibility, and Accountability*, 40 Am.Crim. L.Rev. 1443, 1454 (2003).

court's decision will be reversed only if the error was so prejudicial that it deprived the defendant of a fair trial. *State v. Strong*, 142 S.W.3d 702, 710 (Mo. banc 2004). Trial court error is not prejudicial unless there is a reasonable probability that the trial court's error affected the outcome of the trial. *State v. Zink*, 181 S.W.3d 66, 73 (Mo. banc 2005).

### 2. The Static–99 and MnSOST–R

■ Missouri's SVP statute is civil in nature. *See Kansas v. Hendricks*, 521 U.S. at 367–68, 117 S.Ct. 2072. Admission of expert testimony in civil cases is governed by section 490.065. *State Board of Registration for the Healing Arts v. Edward W. McDonagh*, 123 S.W.3d 146, 153 (Mo. banc 2003). The statute provides, in relevant part:

1. In any civil action, if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

. . .

3. The facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing and must be of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable.

Sections 490.065.1, 490.065.3.

The first issues of admissibility under 490.065.1 are whether "specialized knowledge will assist the trier of fact" and whether the expert is qualified "by knowledge, skill, experience, training, or education" to render an opinion. Sec. 490.065.1. Murrell couches his relevance argument in a way that attacks Dr. Hoberman's utilization of the actuarial instruments in this case as not helpful to the trier of fact under 490.065.1. His focus on that section is misguided. 490.065.1 involves only the questions of whether expert testimony will assist the jury in understanding the evidence or determining a fact in issue and, if so, if the particular expert is qualified to testify. Murrell does not contest those two issues in this case.

■ The admissibility of the actuarial instruments, and Murrell's relevance argument, is controlled by section 490.065.3. Under the statute, if expert testimony is needed and if the expert is qualified to testify under subsection 1, the expert is entitled to base his opinion upon facts or data 1) "of a type reasonably relied upon by experts in the field," and 2) which "must otherwise be reasonably reliable." If facts or data are both reasonably reliable and reasonably relied on by experts in the field when forming an opinion on the matter at issue, they will necessarily be relevant to the case, and testimony as to the facts and data will be admissible.

Dr. Hoberman was asked if the data in this case, the actuarial instruments, were "the type of instruments or data reasonably relied upon by experts in the field in forming opinions about a person's risk of future sexual violence." He answered affirmatively. The State presented evidence of the frequent use of actuarial instruments and their general acceptance in the scientific community. Dr. Hoberman stated that in almost every SVP case he had participated in, "one of the [department of mental health] evaluators has used at least one actuarial measure and typically two, the Static–99 and the MnSOST–R." Dr. Hoberman testified that the Static–99 is used in fifteen of the seventeen states with SVP statutes.

In the past two years, reported cases in at least twelve states have recognized experts' reliance on the Static–99 as a risk-assessment tool in cases involving sexually violent predators.[13] At least five Missouri cases in the past three years reference the admission of the Static–99.[14] Actuarial instruments are not only relied upon by the states in their cases against alleged SVPs, but also by experts for sexual offenders as well. *See In re Commitment of Simons,* 213 Ill.2d 523, 290 Ill.Dec. 610, 821 N.E.2d 1184, 1192, (2004) (citing *People v. Calhoun,* 118 Cal.App.4th 519, 13 Cal.Rptr.3d 166, 168 (2004)). It is clear that actuarial instruments are reasonably relied upon by experts in evaluating a sexually violent predator's risk of reoffense.

The second issue under 490.065.3 is whether the data is reasonably reliable. Dr. Hoberman testified that it was his belief that the MnSOST–R has been validated and is widely accepted. He cited an authoritative text entitled *Evaluating Sex Offenders,* by Dr. Dennis Doren, that advocates the use of the Static–99 and MnSOST–R instruments. He testified that another authoritative text, *Forensic Management of Sexual Offenders,* lists the MnSOST–R as one of the risk assessment tools used in the evaluation of sexual offenders. Dr. Hoberman instructed that the Static–99 has been subject to at least twenty-two cross-validation studies bolstering its reliability. He stated that the

MnSOST–R has also been subject to cross-validation. Indeed, "many scholars have concluded that the predictive efficacy of actuarial methods of risk assessment is superior to clinically derived assessments of risk." E. Janus & R. Prenky, *Forensic Use of Actuarial Risk Assessment with Sex Offenders: Accuracy, Admissibility, and Accountability,* 40 Am.Crim. L.Rev. 1443, 1457 (2003).

There was testimony that, contrary to the contention of Murrell, the Static–99 is relevant to the risk of recidivism for the individual as well as the test group. Dr. Hoberman stated that the instrument provides experts with an indicator of the factors that sex offenders who recidivate have in common. He instructed that the expert then looks at the individual being evaluated to determine whether he possesses the characteristics shown by the Static–99 to be indicative of recidivism. The person being evaluated is then given a score based on the characteristics he or she possesses, which indicates the percentage of likelihood of reoffense *for a person with those characteristics;* in this case Murrell.

Finally, any concern about the accuracy of the actuarial instruments was made known to the jury and goes to the weight the evidence should receive. Dr. Hoberman illuminated the issues surrounding the accuracy of these instruments and their limitations. He agreed that there is

---

**13.** *See People v. Vercolio,* 363 Ill.App.3d 232, 300 Ill.Dec. 159, 843 N.E.2d 417 (2006); *Harris v. State,* 836 N.E.2d 267 (Ind.App.2005); *In re Detention of Shearer,* 711 N.W.2d 733 (Iowa App.2006); *Sweet v. State,* 163 Md.App. 676, 882 A.2d 296 (2005); *Com. v. Chapman,* 444 Mass. 15, 825 N.E.2d 508 (2005); *In re Commitment of Stone,* 711 N.W.2d 831 (Minn. App.2006); *In re Civil Commitment of A.H.B.,* 386 N.J.Super. 16, 898 A.2d 1027 (2006); *In re J.M.,* 713 N.W.2d 518 (N.D.2006); *In re Commitment of Barbee,* 192 S.W.3d 835 (Tex. App.2006); *Com. v. Allen,* 269 Va. 262, 609 S.E.2d 4 (2005); *In re Detention of Elmore v.*

*State,* 134 Wash.App. 402, 139 P.3d 1140, 1142–43 (2006); *In re Commitment of Combs,* 720 N.W.2d 684 (Wis.App.2006).

**14.** *In re Care and Treatment of Kapprelian,* 168 S.W.3d 708 (Mo.App.2005); *Smith v. State,* 148 S.W.3d 330 (Mo.App.2004); *Goddard v. State,* 144 S.W.3d 848 (Mo.App.2004); *Care & Treatment of Wadleigh v. State,* 145 S.W.3d 434 (Mo.App.2004); *Care and Treatment of Scates v. State,* 134 S.W.3d 738 (Mo. App.2004).

no way to know what personality disorders the individuals making up the Static–99 suffered from. He instructed that at least two experts in the field have criticized the MnSOST–R as over-predicting the risk of reoffense. On cross-examination Dr. Hoberman admitted that there is no way to determine for certain that Murrell will commit a sexually violent offense if released. He agreed that he could offer nothing more than probabilities and there was no way to tell whether Murrell would be in the class of the 52 percent of people who were reconvicted, as guided by the Static–99, or the 48 percent who were not. The trial court was correct in finding that the actuarial instruments were reasonably reliable.

This holding does not ignore Murrell's argument that the actuarial instruments are irrelevant because they are a product of the recidivism rate of the test group, not the individual being evaluated. Under the statute, determination of whether the facts and data relied upon are relevant is made relative to the testimony of the expert. If the facts and data are shown to be reasonably relied upon by experts in the field, they are necessarily relevant to the issue the expert is addressing. The only way to attack the admissibility of that information is to show that the facts and data are not the type experts in the field are relying on or are not reliable. Murrell has simply failed to show that actuarial instruments are not reasonably relied upon or that they are not reliable in evaluating an SVP's risk of reoffense.

Additionally, it is essential to note that Dr. Hoberman's testimony indicated actuarial instruments are merely one of many tools considered in the evaluation and that he does not conclude his analysis of a person's future risk on the instruments alone. Dr. Hoberman stated that characteristics unique to the individual are omit-ted from the instruments and must be considered. He reviewed approximately 7,000 to 10,000 pages of Murrell's records during his assessment. He considered Murrell's offense history and personal characteristics, such as his mental abnormality, his past substance abuse, and his periodic refusal to take his medication. In other words, the evidence indicates Dr. Hoberman made his own clinical assessment in coming to a conclusion regarding Murrell's risk of reoffense and the actuarial instruments were used to corroborate his assessment; they were not the sole basis for it.

Admissibility should not be confused with submissibility. The holding today does not suggest that testimony as to the results of an actuarial instrument as applied to an individual standing alone, without the accompanying independent clinical assessment, would be a sufficiently reliable basis to commit an individual as an SVP. As courts in other states have recognized, testimony incorporating the results of actuarial instruments is admissible in cases involving the civil commitment of an SVP when the instruments are used in conjunction with a full clinical evaluation. *See In re Commitment of Simons*, 213 Ill.2d 523, 290 Ill.Dec. 610, 821 N.E.2d 1184, 1192 (2004) (actuarial instruments are generally accepted by professionals who assess sexually violent offenders and therefore are perfectly admissible in a court of law); *In re Detention of Holtz*, 653 N.W.2d 613, 619–20 (Iowa App. 2002) (actuarial instruments admissible when used in conjunction with clinical evaluation). In this case, there was ample evidence that Dr. Hoberman conducted an independent clinical evaluation.

■ Moreover, the sole issue before the Court is whether an expert in a civil commitment trial may testify as to the results of actuarial instruments. The

Court does not hold that an expert can argue based on the Static–99 that the particular offender has a 52% chance of reoffending. Rather, the Court holds the expert may base his or her opinion on actuarials because they constitute facts or data of a type reasonably relied upon and are otherwise reasonably reliable. The expert may testify that according to actuarials a certain percentage of people with characteristics like Murrell's do reoffend; that data can be part of the assessment as to whether Murrell is more likely than not to reoffend because although actuarials are not determinative, they are relevant to that determination.

At trial, the jury heard the following:

[Prosecutor]: "So does it (Static–99) give you any percentages or produce a result that comes out in percentages?"

[Dr. Hoberman]: "The score Mr. Murrell received is associated with a 52 percent chance of being reconvicted for a sex offense over a 15 year period of time."

To the extent this exchange was meant to convey to the jury that Murrell himself has a 52 percent chance of reoffending within the next 15 years, it was a misapplication of the actuarial results. However, the specific question and answer were not objected to by the defense and have not been challenged in Murrell's points relied on. Even had Murrell raised the issue here, the Court would not find plain error. On cross-examination of Dr. Hoberman, the jury heard the following testimony:

[Defense Counsel]: "You don't know if Mr. Murrell would fall in that 52 percent (of individuals who reoffended) or in that 48 percent (of individuals who did not), do you?"

[Dr. Hoberman]: "I do not."

[Defense Counsel]: "There's no way to tell?"

[Dr. Hoberman]: "No way to tell."

[Defense Counsel]: "Wouldn't you agree with me that it's kind of hard to talk specifics regarding Mr. Murrell and the Static–99 if you don't know exactly which side of this he fits in?"

[Dr. Hoberman]: "I think what you can say is what I said, which is that he has characteristics. You don't know which side he fits in, which is why you look at other actuarial measures, to use as many of them as possible to see to what degree they converge."

[Defense Counsel]: "Okay. But looking at the Static–99, you can't say whether Mr. Murrell was in the 52 percent number or the 48 percent number who don't reoffend?"

[Dr. Hoberman]: "Correct."

Any improper characterization conveyed to the jury was cured by Dr. Hoberman's testimony on cross-examination.

In sum, the trial court correctly held that the actuarial instruments utilized by Dr. Hoberman in assessing Murrell's risk of recidivism constituted facts or data of a type reasonably relied upon by experts in the field and which were otherwise reasonably reliable. The testimony regarding Dr. Hoberman's utilization of those instruments was, therefore, admissible under 490.065.

### III. Conclusion

The judgment is affirmed.

STITH, LIMBAUGH and RUSSELL, JJ., concur.

WOLFF, C.J., dissents in separate opinion filed.

TEITELMAN and WHITE, JJ., concur in opinion of WOLFF, C.J.

MICHAEL A. WOLFF, Chief Justice, dissenting.

Mark Murrell is committed for treatment. No matter how much treatment he receives, and no matter how well Murrell responds to treatment, as long as he remains confined, he always will score the same on the statistically based risk assessment instruments the state misuses through expert testimony in this case.

Evidence of statistics-based risk assessment measures, the STATIC–99 and the MnSOST–R, is fundamentally at odds with the constitutional basis on which the state may seek civil commitment of sex offenders who are alleged to be sexually violent predators under section 632.480 *et seq.*

The constitutional basis for these commitments is that they are not punishment, but rather rehabilitative. Civil commitment under Missouri's sexually violent predator law is not criminal punishment, whose objectives are retribution or deterrence. Such laws were upheld by the United States Supreme Court in *Kansas v. Crane*, 534 U.S. 407, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002), and *Kansas v. Hendricks*, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997). The sexually violent predators' confinement is for the purpose of holding the person until his mental abnormality no longer causes him to be a threat to others, and he is permitted to be released on a showing that he is no longer dangerous. *See* section 632.495; *Hendricks*, 521 U.S. at 363, 117 S.Ct. 2072.

In upholding Kansas' sexually violent predator law, the Supreme Court noted that the maximum time an individual can be incapacitated is one year, 521 U.S. at 364, 117 S.Ct. 2072, which is similar to Missouri's statutory scheme. This Court upheld Missouri's sexually violent predator law, relying upon the "multiple opportunities for court review," in finding that our statutory scheme is "narrowly tailored to promote the compelling interest of protecting the public from this small percentage of offenders." *In re Care and Treatment of Norton*, 123 S.W.3d 170, 175 (Mo banc. 2003). As with the Kansas statute, the Missouri statute provides for annual examinations and court review to determine if the person's "mental abnormality has improved with treatment and if the individual remains likely to engage in violent sexual acts if released." 123 S.W.3d at 175, *citing* section 632.498. In these reviews, as this Court has noted, the state has the burden of proving that the person's mental abnormality "has not improved and that it is not safe to release" the sexually violent predator. *Id.*

The statistically based evidence that this Court approves is directly contrary to these constitutionally-based premises. The evidence that purports to show that Murrell has a 52 per cent chance of reoffending in the next 15 years is based on statistical analysis of characteristics that never change. By approving these misused scientific measures, the Court assures that Murrell probably will never regain his liberty no matter how much treatment he receives and no matter how well he responds to it.

The STATIC–99 instrument was developed by researchers in Canada and the United Kingdom using two risk assessment instruments and was validated on a population of several thousand male sex offenders. The purpose of the STATIC–99 is to determine whether a male offender with certain characteristics is at low, moderate-low, moderate-high, or high risk of committing another sexual offense. The STATIC–99 does *not* say that Murrell himself has a 52 percent risk of re-offending. Rather, the STATIC–99 says that 52 percent of a group of male sex offenders who share Murrell's "static" (i.e. unchanging) characteristics committed a new of-

fense within a certain period of time. It is, at most, a generalization about a group, not a prediction as to any individual's future behavior.

The STATIC–99 is an instrument that is useful to sentencing judges in assessing the risk that a particular offender is in a category of persons who are more or less likely to re-offend and is perfectly appropriate at the sentencing stage. The STATIC–99 is being adopted for use by the Missouri Board of Probation and Parole in developing pre-trial sentencing assessment information for trial judges. This instrument is useful in informing the trial judge whether a particular offender shares the characteristics of those persons in a high, moderate, or low-risk group. Although the STATIC–99 does not, in fact, predict future behavior in a particular individual, a sentencing judge may find the assessment helpful in determining what kinds of controls, short of confinement, or what kind of program, in prison or in the community, might work to reduce the chance of recidivism in a particular type of offender. The sentence, as always, is based on the judge's judgment; the STATIC–99 is at best useful in reinforcing that judgment.

The use of this instrument through expert testimony in the civil commitment context, however, is not only wrong, but harmful. The reason that the instrument is inappropriate in civil commitment proceedings is that the characteristics of a confined offender—such as Murrell—will never change.

The STATIC–99 risk assessment methodology is as follows: a one-point value is assigned to each of the following factors, none of which, except age, is subject to

change for a confined man. The higher the score, the greater the statistical risk.

1. Age—a person between the ages of 18 and 25 is scored one point;
2. A person who has never lived with a lover or significant other for at least two years—one point;
3. Present convictions for nonsexual violence—one point;
4. Prior nonsexual violence offense— one point;
5. Prior sexual offenses are identified in three ranges, based upon the number of charges and the number of convictions: depending upon this criminal offense history, points are scored from zero to three;
6. The number of times a person has been sentenced for felonies on different occasions scores an additional point if the person has been sentenced four or more times for any offense;
7. Convictions for non-contact sexual offenses—one point;
8. Unrelated victims—one point;
9. Victims who are strangers to the offender—one point;
10. If the offender has male victims— one point.

When all of these points are added up, an offender is considered low risk if he has zero or one points; if he has two or three points, he is moderate to low risk; if he has three, four or five points, he is rated moderate to high risk; and if he has six or more points, the offender is considered high risk.[1]

What is most noteworthy about this scoring system is that, except for age, the risk score never changes once a person is

---

1. Andrew Harris, Amy Phenix, R. Karl Hanson, & David Thornton, "STATIC–99 Coding Rules—Revised—2003." Available online from the Solicitor General of Canada: www.

sgc.gc.ca: 1) Make language choice 2) Click on "Corrections" 3) Click on "Corrections Reports" 4) Click on "2003."

confined. In other words, items 2 through 10 above will always be part of the confined offender's history, and they do not change. If he is committed civilly with, for example, a score of six or more, when he comes up for evaluation for release, he will still have the same score. It might be one point lower if he passes from under age 25 to over age 25, but that is the only thing that can possibly change about this evaluation. Murrell's score will never change; he is 46 years old. The other risk assessment instrument used by the expert in this case, the MnSOST–R risk assessment methodology developed in Minnesota on a smaller number of sexual offenders than the STATIC–99, shares the same characteristics that make the STATIC–99 inappropriate for use in civil commitment proceedings.

Under the statutory scheme for civil commitment of sexually violent predators, and the constitutional basis on which these laws are upheld, this statistical evidence is irrelevant in a legal sense, even if such evidence seems to be logically relevant.

Evidence must be both logically and legally relevant to be admissible. *See, e.g., Shelton v. City of Springfield*, 130 S.W.3d 30, 37 (Mo.App.2004). The evidence that these statistical assessment instruments present is that, out of large number of offenders, a certain percentage of those in the group having a particular score re-offended during some period of time. Does this have some logical relevance to those offenders in a group sharing Murrells' characteristics? The risk instruments say nothing about him personally. The risk instruments merely say that Murrell has characteristics similar to those of the group whose risk of re-offending is a statistically determined probability. It

says nothing about whether or not Murrell himself is likely to re-offend. In fact, the researchers who developed the STATIC–99 candidly admit that one of the instrument's weaknesses is that "it demonstrates only moderate predictive accuracy." [2] What that means is that the STATIC–99 is better than flipping a coin for predicting the future behavior of individual sex offenders, but not that much better. In this context it is difficult to find any logical relevance.

If the discussion of logical relevance seems uncomfortably arcane, an examination of its legal relevance will bring us to a more comfortable setting. The question of legal relevance is particularly important here because the evidence that purports to present this in scientific or statistical terms is misleading. Legal relevance involves balancing the probative value of evidence against its prejudicial effect on the jury. If the probative value of the evidence is outweighed by its prejudicial effect, it should be excluded.

All that this statistical evidence tends to show is that Murrell is somewhat like members of a group of sex offenders who re-offended in the past. What the jury hears is likely to be quite different—that *this* sex offender, Murrell, has a 52 per cent likelihood of committing another sexual offense. What the jury heard in this case from the state's out-of-state expert was as follows:

"Q Does it (the STATIC–99) give you any percentages or produce a result that comes out in percentages?"

"A The score that Mr. Murrell received is associated with a 52 percent chance of

---

2. Harris, et al. p. 3. The ROC (Receiver Operating Characteristic) curve is .71; this is a statistical way of expressing predictivity. A ROC close to 1.0 would be an excellent rating; a .5 is about the same as flipping a coin.

being reconvicted for a sex offense over a 15–year period of time." [3]

What jury is going to vote to release him from confinement with that "scientific" prediction?

Because of its inherently misleading nature in the civil commitment context, this statistic is not evidence that assists the finder of fact, under section 490.065.1, but in fact is evidence that causes the jury to believe that there is some probative value to it. The principal opinion relies on the expert's testimony—that these risk assessment instruments are relied upon by experts in the field—to make the results admissible under section 490.065.3.[4] A court's duty under this statute is to make sure the "facts or data in a particular case upon which an expert bases an opinion" are "of a type *reasonably* relied upon by experts in the field . . ." and are "otherwise reasonably reliable." (Emphasis added.) In my view, these risk assessments should be excluded if they are logically or legally irrelevant regardless of what the expert says about their use by other experts in the field because the use of irrelevant facts or data is inherently unreasonable. Nor are these facts and data "otherwise reasonably reliable," as I have discussed.

Under this expert testimony, it is asserted that Murrell currently has a 52 per cent chance of re-offending within 15 years. More accurately stated, 52 percent of a group of untreated sex offenders who shared Murrell's characteristics re-offended. On this basis the state says Murrell should be committed civilly.

At his next review, however, the same evidence can be adduced, under the principal opinion's analysis. In two years, three years, and so on, upon each annual review, he will still have a 52 per cent change of re-offending within 15 years, because Murrell's "static" characteristics will not have changed. This is true no matter how much treatment Murrell has received, no matter what the results.

The treatment that Murrell will be afforded by this civil commitment is designed to train him to curb his impulses. With treatment, he may become adequately trained to control his impulses, but using these statistical measures, he will still have a "52 per cent risk" of re-offending within 15 years. Does anyone remember the Soviets' misuse of their mental health system for incarcerating enemies of the state? Does this seem at all similar?

---

3. It is difficult to see how the quoted testimony does not violate the principal opinion's rationale, stated in its penultimate paragraph:

> Moreover, the Court does not hold that an expert can argue based on the Static 99 that the particular offender has a 52% chance of reoffending. Rather, the Court holds the expert may base his or her opinion on actuarials because they constitute facts or data of a type reasonably relied upon and are otherwise reasonably reliable. The expert may testify that according to actuarials a certain percentage of people with characteristics like Murrell's do reoffend; that data can be part of the assessment as to whether Murrell is more likely than not to reoffend because although actu-

arials are not determinative, they are relevant to that determination.

Although the expert's statement about the STATIC–99 is couched in expert-speak ("is associated with") it is difficult to believe that any lay person on a jury would understand this to mean something other than that Murrell has a 52 percent risk of re-offending.

4. Section 490.065.3 provides: "The facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing and must be of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable."

The use of the STATIC–99 and the MnSOST–R methodologies in the civil commitment proceeding is a scientifically-based means to justify confining Murrell for the rest of his life regardless of the outcome of his treatment. The old Soviet Union is gone, but is its legacy of misusing its mental health system alive and well in this country?

I would grant Murrell a new trial with this statistically based evidence excluded. I respectfully dissent.