**Deborah Marie MARTIN,
et ux, Respondents,**

v.

**MERCY HOSPITAL SPRINGFIELD,
d/b/a Mercy Villa, Appellant.**

**No. SD 34573**

Missouri Court of Appeals,
Southern District,
Division Two.

FILED: April 12, 2017

Motion for Rehearing and/or Transfer to Supreme Court Denied May 4, 2017

Rehearing Denied May 26, 2017

---

Appellant's attorneys: Kregg T. Keltner & Philip R. Quinn

Respondents' attorneys: James E. Corbett & Daniel P. Malloy

DANIEL E. SCOTT, J.

Deborah Martin tripped on a crank protruding from a relative's hospital bed at Mercy Villa, a skilled nursing facility. A jury assessed Mercy 70% of the fault and liability for Ms. Martin's injuries and denied her husband's consortium claim. Mercy appeals, raising three points. We affirm.

### Points I & II

We take in reverse order Mercy's charges that the trial court erred in refusing to grant a mistrial or strike the venire due to allegedly prejudicial remarks by panelists during voir dire.

Mercy argues in Point II that Ms. Martin's counsel stipulated to such relief and the trial judge "refuse[d] to enforce a stipulation against the will of both parties."

Yet it was only *after* the verdict, via newtrial motion, that Mercy first cited such "stipulation" or claimed the court had to honor it. This was too late. *Cf. State v. Marr*, 499 S.W.3d 367, 377 (Mo.App. 2016) (even a criminal defendant convicted by an unconstitutionally-composed jury waives relief by failing to give the trial judge an opportunity to act while correction remains possible). We deny Point II without need to detail other doubts about Mercy's "stipulation" claim.

We also reject Point I's more general charge that "multiple prospective jurors made inflammatory or prejudicial statements toward Mercy," so the trial court erred in denying Mercy's motions for mistrial or to strike the venire.[1]

The trial court enjoyed broad discretion in ruling Mercy's motions. *State v. Stewart*, 296 S.W.3d 5, 9 (Mo.App. 2009). That court was best positioned to assess any effect of alleged improprieties; we will not reverse unless we find a clear abuse of discretion; *i.e.*, an illogical, arbitrary, unreasonable, ill-considered ruling that shocks a sense of justice. *Id.* at 9–10. We presume the trial court ruled correctly (*id.* at 10) and Mercy must prove otherwise by showing that the challenged comments were so inflammatory and prejudicial as to transgress Mercy's right to a fair trial. *State v. Sprinkle*, 122 S.W.3d 652, 668–69 (Mo.App. 2003).

In these respects, Mercy's complaints fall woefully short. Although Mercy repeatedly labels the cited comments "unsolicited," *none* of them were. All six were in response to questions posed by the court or counsel; only two can fairly be said to criticize Mercy or Mercy Villa (Ms. Sammon and Mr. Daniel's first response); and "[t]here are many cases where state-

---

1. The appendix collects all of Mercy's cited comments, with panelists' names bolded.

ments far more inflammatory or prejudicial than those by any of the jurors in this case were not considered grounds to quash the panel or declare a mistrial." *Id.* at 669 (citing examples). The trial court's ruling was not illogical, arbitrary, unreasonable, ill-considered, or shocking to a sense of justice. Point I fails.[2]

## Point III

■ Mercy also complains that Ms. Martin testified, over hearsay objection, that personnel escorting her to her car after the fall said they too had nearly fallen in similar fashion and the hand cranks were a problem.[3]

■ We find it fairly debatable that this *was* hearsay, offered for its truth, without sufficient foundation to admit it as Mercy's own statement (admission of a party opponent). Even so, *arguendo*, this point fails because

> "[t]he improper admission of hearsay evidence requires reversal [only] if such evidence is prejudicial." *Saint Louis Univ. v. Geary*, 321 S.W.3d 282, 291

(Mo. banc 2009). "A complaining party is not entitled to assert prejudice if the challenged evidence is cumulative to other related admitted evidence." *Id.* at 292 (internal quotation omitted). "Cumulative evidence is additional evidence that reiterates the same point." *Id.*

*Freight House Lofts Condo Ass'n v. VSI Meter Services, Inc.*, 402 S.W.3d 586, 593 (Mo.App. 2013). In other words, we cannot find that Mercy was prejudiced because "the challenged evidence [was] merely cumulative to other admitted evidence of like tenor." *Missouri Land Dev. I, LLC v. Raleigh Dev., LLC*, 407 S.W.3d 676, 689 (Mo.App. 2013).[4]

Leslie Newberry, who had worked at Mercy Villa as an LPN and knew the bed-crank type at issue, testified that it was "common for staff to, you know, run into them because people get busy and they forget to fold them back underneath the bed. So it's very common for us to run into them with our shins or ankles depending on the height of the bed." She further testified:

Q. And they were very nice to you?
A. They were very nice.
Q. And you told them that you had tripped over the bed crank?
A. Yes. They knew that. Yes.
Q. What did they say in response to that?
A. Well, about the time we got to the car they mentioned that, both of them, that they had almost fallen on those cranks, that they're a problem.
　THE COURT: I'm sorry. I didn't hear you, ma'am.
A. That they both had fallen—nearly fallen on those cranks, that they were a problem.
Q. Did you think anything about that?
A. No. I just—well, I kind of thought I could see where that would happen.

---

**2.** Mercy's appellate assertions that Ms. Baumgartner's bed-crank response (see appendix's last page) "amounted to expert testimony in Martin's favor," and "was the same as having an unsworn expert witness testify about material issues during voir dire," border on the frivolous and were never presented to the trial court for consideration. "Such argument will not be permitted when raised on appeal for the first time, thereby denying the trial court the opportunity to address the claimed error." *Khulusi v. Southwestern Bell Yellow Pages, Inc.*, 916 S.W.2d 227, 230–31 (Mo.App. 1995).

**3.** To specifically quote Ms. Martin's challenged testimony:

Q. You were at the administrator's office in a wheelchair; is that correct?
A. Yes.
Q. And the two—well, two of the three employees that picked you up wheeled you out to your car?
A. Yes, they did.

**4.** This follows from the general principle that evidentiary error merits reversal only if prejudice is demonstrated; *i.e.*, a reasonable probability that such error affected the trial's outcome. *See S.F.M.D. v. F.D.*, 477 S.W.3d 626, 636 (Mo.App. 2015); Rule 84.13(b).

Q. Now at Mercy Villa have you ever hit your shin on a bed crank that was left out?

A. Yeah, 'cause I remember like—I don't know, it was like the first or second day that I was working there. I worked on a hall and there was a room just like almost in front of the nurse's station down a hallway there. And the bed was along the side of the wall, but the crank kind of stuck out in the doorway, if it was left out. And I went in there to do a treatment on a lady and was putting Vicks on her toe nails. Anyways, I hit my shin on it.

Q. Now did you fall?

A. No, I didn't fall. I caught myself with the bed, but it sure hurt.

Q. Okay. It is an uncommon phenomenon in a nursing home setting to run into those manual cranks, if they have still have manual beds?

A. They're often left out because like I said, people—staff get in a hurry because, I mean, you're dealing with like 20 or 30 people that you're usually taking care of, you know, in a hallway.

And so people get in a hurry like when they're laying people down or they're getting people up and sometimes they get called into another room because of something. So they sometimes forget to put the cranks back underneath the bed. I mean, it's just human nature almost to sometimes forget that when you're in a hurry.

The foregoing was admitted without objection, is not complained of on appeal, and is of like tenor and reiterates the same point as Ms. Martin's testimony. Thus, "[i]n light of other evidence in the case, [the challenged] statements were cumulative and were not prejudicial." *Freight*

*House Lofts,* 402 S.W.3d at 593. Mercy's arguments to the contrary are wholly unpersuasive. We deny Point III and affirm the judgment.

GARY W. LYNCH, P.J.—CONCURS

WILLIAM W. FRANCIS, JR., J.—CONCURS

APPENDIX

**Jury Panelist Comments
Cited by Mercy**

1. Mr. Siegmann, Ms. Baumgartner, and Ms. Sammon responded to the trial court's panel question: "Does anybody have any personal or business relationship or—with Mercy Hospital or Mercy Villa?":

**VENIREPERSON SIEGMANN:** Yes, sir. Matthew Siegmann. My mother was a pharmacist with Mercy from 1988 to 2006, at which time she switched working to Walgreen's. She worked at the main hospital in the pharmacy there and was, at one point, a supervisor for a few years. And so—then she did switch jobs because of a dispute over retirement benefits so.

THE COURT: Okay. Well, let's get right to that, sir. Certainly, understanding she's your mother and understanding that she had had a dispute about that matter, do you think that would make it hard for you to set aside your mom's situation and her dispute so that Mercy and the plaintiffs started out at the same spot in this case?

VENIREPERSON SIEGMANN: I really don't know. I just wanted to disclose the information. Most of the time she worked there I was just a kid. But it's hard to say if I could be impartial on that or not, so.

THE COURT: Okay. Thanks for letting us know, sir. We appreciate it.

\* \* \*

THE COURT: And in the back row—was there another hand on the third row? I'm sorry. Tell us your name, please.

[VENIREPERSON BAUMGART-NER]: Holly Baumgartner.

THE COURT: Ms. Baumgartner, go ahead.

VENIREPERSON BAUMGARTNER: In 2004, I worked for Mercy for a year as a licensed practical nurse.

THE COURT: And that was 2004 you said?

VENIREPERSON BAUMGARTNER: Mm-hmm. Yes.

THE COURT: What were your duties then?

VENIREPERSON BAUMGARTNER: I was a nurse, an LPN, just the same as a registered nurse.

THE COURT: Okay. But no particular specialty or floor you were assigned to?

VENIREPERSON BAUMGARTNER: I was on the cardiac floor.

THE COURT: The cardiac. Same question, ma'am. Anything about your experience or departure that, bad or good, that you think would make it hard for you to be neutral and treat Mercy the same as you would the plaintiffs in this case?

VENIREPERSON BAUMGARTNER: No, sir.

THE COURT: Thanks for letting us know. All right. In the back row, is that Ms. Sammon?

VENIREPERSON SAMMON: Yes.

THE COURT: Stand up, please. Thank you. Go ahead.

VENIREPERSON SAMMON: My father was a resident at Mercy Villa, and that was for about eight months in 2005 to 2006.

THE COURT: Okay. All right, ma'am. Anything about your view or assessment of his experience there?

VENIREPERSON SAMMON: Yes, very definitely. My father was there and I was unhappy with the physician and unhappy with the facility—

THE COURT: Okay.

VENIREPERSON SAMMON: —at that time, and I had him removed.

THE COURT: Okay. You said that was 2005 to 2006?

VENIREPERSON SAMMON: That's correct.

THE COURT: It sounds then that from what you're saying, that you think it might be difficult for you then to have Mercy Villa be a party in this case and have them—

VENIREPERSON SAMMON: That's correct. Yes, that is correct.

THE COURT: —start out at the same point?

VENIREPERSON SAMMON: It would make it difficult for me.

THE COURT: Thanks for letting us know. We appreciate your candor.

2. Mr. Daniel replied to Ms. Martin's counsel's panel question whether anyone "thinks there may be something in their background . . . maybe you've had some dealings with [Mercy] that you think that might make you lean one way or the other?":

[VENIREPERSON DANIEL]: Latimer Daniel, No. 11. First question is, if we know that there is some point to where we may lean one way or another, can we leave earlier?

MR. CORBETT: You know, those sort of questions I don't control the process.

VENIREPERSON DANIEL: Well, the reason why I ask is, because one thing is, my sister also works for Mercy in their—she worked in the cafe. She started off as a cleaner in the main hospital and then they moved her to the cafe. But the way that they had let her go and the way they let me go and a couple of my friends go, I do have a little issue with Mercy, even after they had switched 'cause I said, they should have never took the name, "Mercy," 'cause they're not merciful to no one and how they treat people.

So I have a little problem with Mercy. I mean, I try not to let it interfere with my thought and logic, but there is a little fuse in me that has a problem with Mercy.

MR. CORBETT: Like that boxer dog.

VENIREPERSON DANIEL: Yes.

MR. CORBETT: That wouldn't be fair—that wouldn't be fair to—

VENIREPERSON DANIEL: To Mercy.

MR. CORBETT: —to Mr. Keltner and his client, Mercy, if he starts out with one strike against him. And you would agree with that?

VENIREPERSON DANIEL: Right.

3. Mr. Daniel and Ms. Baumgartner responded to Ms. Martin's counsel's panel question: "Has anybody ever hit a manual bed crank before?:

[MR. CORBETT]: Has anybody ever hit a manual bed crank before? Go ahead. Tell me about it.

[VENIREPERSON DANIEL]: Yeah, Latimer Daniel, one more time, No. 11. I used to work as a CAN when I was younger back in the '90s, so I worked for Hill Haven, that was right across the street from Mercy. And that's where we always sent all of our people that fell

and stuff. And we did have manual cranks in the beginning before we started doing automatic. So I worked and I hit one myself by not paying attention to what my other co-worker did.

MR. CORBETT: Thank you, sir. Yes, ma'am. Your name and number.

[VENIREPERSON BAUMGARTNER]: Holly Baumgartner, No. 23. I have many bruises on my shins from kicking the manual cranks.

MR. CORBETT: How long ago was that?

VENIREPERSON BAUMGARTNER: It was—I worked for a facility for six years. I started out as a floor nurse, went all the way up to pretty much administration. I was the MDS coordinator, and that was probably four years ago. And many times in that six years I walked into rooms and flat kicked the cranks.

MR. CORBETT: Well, did you get any training with regard to what you're supposed to do with those cranks once you use them?

VENIREPERSON BAUMGARTNER: Yes. Yes.

MR. CORBETT: And so you know what the proper procedures are?

VENIREPERSON BAUMGARTNER: Yes.

MR. CORBETT: And you're trained in that then?

VENIREPERSON BAUMGARTNER: Yes.

MR. CORBETT: Thank you. Let me ask you this. Knowing that we're alleging we hit a crank that wasn't put back under the bed, is that going to affect your judgment?

VENIREPERSON BAUMGARTNER: No.