Colleen Dolan, P.J.
J.D.B. appeals the judgment from Lincoln County Circuit Court committing him to the care, custody, and treatment of the Department of Mental Health because he was found to qualify as a "sexually violent predator" (a "SVP") within the meaning of § 632.480(5) of the Sexually Violent Predator Act (the "SVPA").[1] This determination was made at a jury trial held in the Lincoln County Circuit Court, Probate Division. J.D.B. offers six points on appeal. In his first three points, J.D.B. challenges the constitutionality of the SVPA's statutory scheme, which includes §§ 632.480-632.513. Additionally, J.D.B. raises challenges specific to his trial in his last three points. After reviewing the record and applicable law, we affirm the judgment of the trial court.
I. Jurisdiction
Because J.D.B. raises several arguments challenging the constitutionality of the SVPA, we must examine whether our Court has jurisdiction over this appeal. "[A]rticle V, section 3 of the Missouri Constitution vests the Missouri Supreme Court with exclusive appellate jurisdiction in all cases involving the validity of a statute." Matter of Brown v. State , 519 S.W.3d 848, 853 (Mo. App. W.D. 2017) (quoting McNeal v. McNeal-Sydnor , 472 S.W.3d 194, 195 (Mo. banc 2015) ). Nonetheless, this exclusive appellate jurisdiction is only invoked when the constitutional issues are *667 "real and substantial, not merely colorable." Id. (quoting McNeal , 472 S.W.3d at 195 ). "When a party's claim is not real and substantial, but, instead, merely colorable, our review is proper." Id. (quoting Ahern v. P & H, LLC , 254 S.W.3d 129, 134 (Mo. App. E.D. 2008) ). In light of the Supreme Court of Missouri's recent disposition of Kirk v. State , 520 S.W.3d 443, 448-49 (Mo. banc 2017) and Nelson v. State , 521 S.W.3d 229, 231 (Mo. banc 2017), "each of the constitutional challenges [J.D.B.] raises have been addressed by either the United States Supreme Court or the Missouri Supreme Court," which means "they are merely colorable." See Matter of Brown v. State , 519 S.W.3d at 853 (internal citations omitted). Thus, we have jurisdiction over this appeal. Id.
II. The SVPA
In order to commit an individual to the custody of the Department of Mental Health as a sexually violent predator, the State is required to prove-with clear and convincing evidence-that the individual "(1) has committed a sexually violent offense; (2) suffers from a mental abnormality; and (3) this mental abnormality 'makes the person more likely than not to engage in predatory acts of violence if not confined in a secure facility.' " Kirk, 520 S.W.3d at 448-49 (quoting § 632.480(5)).
III. Factual and Procedural Background
Around the age of 15, J.D.B. began to realize he "was interested in" younger children. Around this time, he began to use "general pornography." He continued using "general pornography" exclusively until he became 19, at which time, the content's stimulating effects had greatly diminished. In response, "he moved on to more deviant pornography, which included exposure to child pornography." Several years later, "in the neighborhood of about 2002 or [2003]," he began living with his sister, her partner, and her partner's daughter ("K.W."). K.W. was five years old when J.D.B. began having sexual contact with her. Dr. Rick Scott, a licensed psychologist, described how the sexual contact escalated:
It progressed over two and a half years of putting his finger inside her vagina, having her kiss him, or he would kiss her. Having her masturbate him with her hand, and on one occasion, making her perform oral sex on him. This went on on a very regular basis, two to three times per week, when he was in the home ... he was routinely sexually abusing her ... until around 2005 when he was arrested for possession of child pornography and removed from the home.
J.D.B. was on probation from 2005 through 2008 for the possession of child pornography. During that time, K.W. disclosed that J.D.B. had committed sexual offenses against her. Ultimately, J.D.B. pleaded guilty to Child Molestation in the First Degree, resulting in him being imprisoned until 2011, when he was paroled. Before being paroled, J.D.B. completed a Missouri Sexual Offender Treatment Program. J.D.B.'s parole was revoked in 2012 due to using child pornography. J.D.B. admitted that he resumed masturbating to fantasies of children as recently as five months before the trial for the current case, despite receiving treatment beforehand.
On December 16, 2013, the State filed a petition seeking the civil commitment of J.D.B. as a sexually violent predator under the SVPA, §§ 632.480-632.525. See Nelson , 521 S.W.3d at 231. A jury trial was held from March 28-30, 2016, in the Lincoln County Circuit Court, Probate Division. The jury concluded that J.D.B. qualified as a SVP under the SVPA, and the court ordered that J.D.B. be "committed to the custody of the director of the Department *668 of Mental Health for control, case and treatment until such time as [J.D.B.'s] mental abnormality has so changed that he is safe to be at large."
The trial court's judgment was initially appealed to our Court under Case Number ED104442 in May of 2016. On January 1, 2017, J.D.B. filed an application to transfer the case to the Supreme Court of Missouri pursuant to Rule 83.01, explaining that this case "presents constitutional challenges to the statutory provisions of the SVP Act identical to the issues presented" in two matters that were then-pending before the Court: Kirk , 520 S.W.3d at 443 and Nelson , 521 S.W.3d at 229. On February 8, 2017, our Supreme Court granted J.D.B.'s transfer request (case number: SC96221). On July 13, 2017, the Supreme Court of Missouri retransferred the cause to our Court under Case Number ED104442-01 in light of its disposition of Kirk and Nelson . The retransferred cause is the focus of this appeal.
Testimony of Dr. Rick Scott
At trial, the State largely relied on the testimony of Dr. Rick Scott to make its case for the commitment of J.D.B. In fact, Dr. Scott was the only witness called by the State. Dr. Scott has a PhD in Clinical Psychology, and he has been a licensed Psychologist in Missouri since 1992. Dr. Scott interviewed J.D.B. for four hours on March 11, 2014. He also reviewed approximately 3,800 pages of records related to J.D.B.'s history. Dr. Scott noted that these are the types of records that are "reasonably relied on by professionals in [his] field in assessing a person's mental condition and risk."
Additionally, Dr. Scott used three types of "instruments generally relied on by professionals in [his] field [for] assessing a person's future risk of sexual offending": the Static 99, the Static 2002, and the Stable 2007. These instruments are "actuarial assessments" that try to measure an individual's risk of reoffending based on a variety of factors. See Matter of Sohn , 473 S.W.3d 225, 228 (Mo. App. E.D. 2015). On the Static 99, J.D.B. received a raw score of 6, which is classified as being in the "high-risk" of reoffending category and placed J.D.B. in the 94th percentile among sex offenders. Dr. Scott explained that this test could be interpreted as meaning, "if you have 100 sex offenders in the room, 93 are less risky than [J.D.B.]." On the Static 2002 assessment, J.D.B. received a raw score of 6, placing him in the 88th percentile and in the high-risk category. Dr. Scott noted that the Static 99 and Static 2002 had a lot of similarities, but the Stable 2007 was "very different," in terms of which variables were used in computing a score.[2] On the Stable 2007, J.D.B. scored a 14 out of 26, which also put him in the high-risk category. Dr. Scott also noted that the 5-year recidivism rate of someone with the same score as J.D.B. (from the Static 99 test) would be "in the neighborhood of 20.5 percent," with the recidivism rate meaning the person was "rearrested or reconvicted in five years." Nonetheless, Dr. Scott concluded J.D.B. was "more likely than not" to commit a sexually violent offense if he was not committed.
Dr. Scott explained the apparent discrepancy. First, Dr. Scott noted that "sex offenders don't get caught, reported, arrested and convicted at a very high rate." Thus, the 5-year recidivism rate from the *669 assessment underestimates the number of sexually violent offenses that are actually committed during that 5-year period, as the data does not capture offenses that do not lead to arrests or convictions. Moreover, Dr. Scott explained that the score vastly underestimates the "potential lifetime risk" for reoffending, as the 20.5 percent metric only accounts for a 5-year period. He testified that although the likelihood of reoffending declines after the first 5-year period, the total likelihood of reoffending over the course of the offender's life is much higher than 20.5 percent on average. For example, he estimates the number would increase to about 30 percent likelihood of being rearrested or reconvicted if measured over a 10-year period.
Taking everything into account, Dr. Scott explained his concern of J.D.B. repeating predatory acts of sexual violence if he was not committed:
I believe that in [J.D.B.'s] mind right now he actually does not want to perpetrate against another child. I definitely believe that. But my concern, as I look at this case and I look at the risk factors and I look at his behavior when he had the opportunity to apply his treatment, I don't believe that he's going to be able to manage his behavior in a way that's going to protect potential victims.
Dr. Scott noted that J.D.B.'s inability to avoid child pornography when he was on parole was a cause for concern. He had accessed the child pornography while he lived with his parents, which led to his parole being revoked. His parents kept the computer in their room and prohibited him from using the computer. Typically, the parents would lock their room when they were not in the house. J.D.B. found where the key was hidden, and he would unlock the door and use the computer to view child pornography while his parents were out of the house. Dr. Scott explained this was worrisome because it shows J.D.B. was unable to apply what he knew from the Missouri Sexual Offender Treatment Program to refrain from accessing such content. Additionally, the threat of parole revocation did not deter him from viewing child pornography. Dr. Scott also believed that child pornography was "his path to a contact offense to a new victim," because he believed that J.D.B.'s viewing of such pornography was influential in the predatory acts committed against K.W. Dr. Scott noted that J.D.B. had continued to escalate his behavior to satiate his needs: he began by viewing child pornography, he then began fondling K.W. over her clothes, and "it got more and more intrusive" as time progressed.
Dr. Scott ultimately concluded, "[i]t is my opinion to a reasonable degree of certainty that [J.D.B.] suffers from a mental abnormality and that that mental abnormality does make him more likely than not to commit predatory acts of sexual violence if not confined to a secure facility."
Testimony of J.D.B.'s Witnesses
Four witnesses were called on J.D.B.'s behalf: Pastor Bob Ingle, J.D.B.'s father ("Father"), Dr. Louis Rosell, and J.D.B. testified on his own behalf. These four witnesses covered many of the same subjects, including the history and development of J.D.B.'s interest in children, his progress in controlling this interest, as well as his educational and social struggles throughout his life. As the evidence adduced at trial is most pertinent to our analysis under Point V (whether the State made a submissible case) and we disregard any evidence that does not support the jury's verdict, we will limit our discussion here and adduce the particulars of these witnesses' testimony as they become relevant.
*670 IV. Discussion
a. Point I-Burden of Proof
In J.D.B.'s first point on appeal, he claims the trial court erred in giving Instruction 5 to the jury because it only required a "clear and convincing" burden of proof, but SVP proceedings are "punitive," and therefore require a "beyond a reasonable doubt" burden of proof to satisfy due process. This argument has recently been addressed by the Supreme Court of Missouri in Kirk , and it controls the outcome of Point I. See Kirk v. State , 520 S.W.3d 443.
In Kirk , our Supreme Court found that even though SVPA "proceedings involve a liberty interest, they are civil proceedings." Id. at 450 (quoting In re Care & Treatment of Van Orden , 271 S.W.3d 579, 585 (Mo. banc 2008) ). Additionally, the Court reaffirmed its previous finding from Van Orden , explaining that both the Supreme Court of Missouri and the United States Supreme Court have held "a clear and convincing burden of proof is sufficient for a civil commitment proceeding to pass constitutional muster." Id. at 452 (citing Van Orden , 271 S.W.3d at 586 and Addington v. Texas , 441 U.S. 418, 432, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) ).
Accordingly, we deny Point I.
b. Point II-Various Constitutional Challenges
J.D.B. argues that the entire statutory scheme of §§ 632.480-632.513 is unconstitutional as amended in 2006, claiming the statutes are punitive in that they (1) do not require the least restrictive environment, (2) infringe on J.D.B.'s right to silence, (3) provide the State with a right to a jury trial, and (4) permit lifetime confinement without constitutional safeguards allowing for release.[3] Accordingly, J.D.B. asserts that the SVPA "violates due process, equal protection, double jeopardy and ex post facto prohibitions."
Several of J.D.B.'s arguments presume the SVPA is a criminal (or at least "punitive") statutory scheme, thereby invoking certain constitutional rights because "criminal protections must apply." Examining the SVPA after the 2006 amendments, the Missouri Supreme Court rejected this argument, stating "[t]his is incorrect ... the SVPA evidences no punitive intent ... [i]nstead, even though SVPA 'proceedings involve a liberty interest, they are civil proceedings.' " Kirk, 520 S.W.3d at 450 (quoting Van Orden , 271 S.W.3d at 585 ) (applying Kansas v. Hendricks , 521 U.S. 346, 368-69, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) to the SVPA). Accordingly, to the extent J.D.B.'s positions rely on SVP proceedings being characterized as "criminal" or "punitive" proceedings, they necessarily fail.
Least Restrictive Environment
J.D.B. contends that failure to consider and provide the "least restrictive environment" or "alternative and less harsh methods" of confinement "violates equal protection and double jeopardy because it shows that the legislature's purpose was to punish." In Norton , the Supreme Court of Missouri found:
[S]ecure confinement of persons adjudicated to be SVPs, as provided in sections 632.480 to 632.513, is narrowly tailored to serve a compelling state interest. The State has a compelling interest in protecting the public from crime. This interest justifies the differential treatment of those persons adjudicated as sexually violent predators when, as determined by the legislature, *671 such mental abnormality makes them distinctively dangerous because of the substantial probability that they will commit future crimes of sexual violence if not confined in a secure facility.
In re Care & Treatment of Norton , 123 S.W.3d 170, 174 (Mo. banc 2003), as modified (Jan. 27, 2004). J.D.B., however, argues the rationale in Norton is inapplicable after the 2006 amendments to the SVPA. During the pendency of this appeal, our Supreme Court invoked Norton in rejecting a functionally equivalent argument, reasoning that the SVPA-in its current form-does not violate the equal protection clauses in Missouri's Constitution or the Fourteenth Amendment.[4] Kirk , 520 S.W.3d at 450-51 (citing Norton , 123 S.W.3d at 174 ).[5]
Rights to Counsel and Silence
J.D.B.'s argument regarding his rights to counsel and silence is somewhat opaque. For example, even assuming J.D.B. was entitled to these rights, he does not explain how they were violated in this case.[6] Additionally, J.D.B. fails to clearly explain the bases for possessing these rights. Several times, he references "due process" and argues that SVP proceedings are punitive in nature and require criminal protections. Although not mentioned in J.D.B.'s Appellant's Brief, he also notes in his Appellant's Reply Brief: "[J.D.B.] also claims the right to silence under the Fourteenth Amendment's Due Process and Equal Protection clauses ... [h]e claims that since all others subject to criminal proceedings and to civil commitment in Missouri have the right to remain silent, he must as well."
In support of his equal protections argument, he largely relies on Bernat v. State , 194 S.W.3d 863, 866 (Mo. banc 2006). In Bernat , "the state argued in closing that Mr. Bernat's failure to testify provided a reason to doubt his claim that he had changed and no longer presented an undue risk of committing another sexually violent offense[.]" Id. at 865. On appeal, Bernat claimed that "since all others accused of crime and all other persons subject to involuntary civil commitment in Missouri have the right to remain silent and not have an adverse inference drawn against them for exercising that right, he has a right to be accorded that privilege also." Id. at 867. The Supreme Court of Missouri agreed with Bernat, finding the differential treatment of Bernat violated his equal protection rights. Id. at 870-71.
We find Bernat's holding is much more limited than J.D.B. appears to suggest. Relying on Bernat, J.D.B. argues that "since all others subject to criminal proceedings and to civil commitment in Missouri have the right to remain silent, [J.D.B.] must as well." The Supreme Court of Missouri did not make a broad proclamation *672 that individuals involved in SVP proceedings maintain the exact same rights as individuals involved in other forms of involuntary commitment proceedings. Rather, the Court noted that the specific facts of the case violated Bernat's equal protection rights because the State's argument that Bernat's silence created an adverse inference "[did] not further the compelling interest identified by the state and [was] not narrowly tailored to accomplish that purpose." Id. Bernat's usefulness in J.D.B.'s case is limited to the framework it provides for courts to assess equal protection claims, which involves a fact-specific two-part analysis.
In Bernat , the alleged violation of the equal protection clause was clear: the State's use of Bernat's silence to create an "adverse inference" that Bernat was more likely to commit a sexually violent offense if not confined in a secure facility. Id. at 866-67. In the case at bar, J.D.B. fails to allege how his right to silence was violated. Accordingly, we cannot engage in the two-part analysis used in Bernat to assess J.D.B.'s equal protection complaint.
Additionally, to the extent J.D.B. relies on characterizing SVP proceedings as "criminal" or "punitive" to claim his due process was violated, his argument is thwarted by precedent. Missouri courts have maintained that the SVPA is not a "punitive" or a "criminal" statutory scheme. See Nelson , 521 S.W.3d at 232 ("Nelson's constitutional claims proceed principally from his assertion that the purpose and effect of the SVPA is punitive ... this and similar assertions (as well as the constitutional claims flowing from them) have been thoroughly reviewed and rejected by this Court in the past."); see also Kirk , 520 S.W.3d at 450 ("One common theme in Kirk's arguments is that SVPA is a criminal statute because its purpose is to punish offenders for past conduct ... [t]his is incorrect."); see also Van Orden , 271 S.W.3d at 585.
Regarding the federal forum, J.D.B. primarily relies on Van Orden v. Schafer , 129 F.Supp.3d 839 (E.D. Mo. 2015). During the pendency of J.D.B.'s appeal, the United States District Court, E.D. Missouri, vacated the part of the Schafer opinion that supported J.D.B.'s position. Van Orden v. Stringer , 4:09CV00971 AGF, 262 F.Supp.3d 887, 894, 2017 WL 2880348, at *6 (E.D. Mo. July 6, 2017). Upon reconsideration, in light of the Eighth Circuit's decision in Karsjens v. Piper , 845 F.3d 394 (8th Cir. 2017), the Stringer court vacated its "Amended Memorandum Opinion" from Schafer in part, finding the Karsjens 's decision was "binding" on the district court. Stringer , 262 F.Supp.3d at 892-94, 2017 WL 2880348 at *5-6. Accordingly, J.D.B.'s citations to Schafer no longer possess any persuasive value.
Based on the foregoing, in regards to J.D.B.'s rights to counsel and silence, he cannot establish that his rights of due process or equal protection have been violated.
Jury Trial Demand
J.D.B. argues that "[b]ecause the [SVPA] is punitive in effect or purpose, then like in every other criminal proceeding in Missouri, the right to a jury belonged exclusively to [J.D.B.]," and he should have been able to "waive that right and be tried by the bench by the Court's consent." As aforementioned, we reject J.D.B.'s premise that the trial was a "criminal" and/or "punitive" proceeding. "In civil cases generally, neither side has a right to a bench trial over the objection of the other party," and "the SVPA is consistent with the law applicable to civil cases generally." State ex rel. Nixon v. Askren , 27 S.W.3d 834, 838 (Mo. App. W.D. 2000). Moreover, we note that there is no constitutional *673 right to a bench trial for a criminal defendant; the Sixth Amendment, as applied to the states through the Fourteenth Amendment, only grants a criminal defendant the right to be tried by an impartial jury. See id. at 839-40 (citing Duncan v. Louisiana , 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) ) ("[W]e see no constitutional right to a bench trial in criminal cases or civil commitments cases."). Accordingly, J.D.B.'s constitutional rights were not violated by the court holding a jury trial.
Release Procedures
In J.D.B.'s last argument under Point II, he claims the SVPA is unconstitutional in that it permits lifetime confinement without constitutional safeguards allowing for release. The Supreme Court of Missouri entertained a similar argument in Kirk . There, Kirk argued his constitutional rights were violated because "the purpose and effect of the SVP Act is punitive, lifetime confinement in DMH ... [and] the law does not provide a least restrictive environment or release men once no longer mentally ill or dangerous." Kirk , 520 S.W.3d at 449. The Court found that accepting Kirk's argument would require that it "depart from the relevant precedents" as his "entire collection of arguments has been previously rejected in the past." Id. at 450. Additionally, "Missouri's SVP commitment program is not life imprisonment without the possibility of probation or parole, it is a treatment program from which a person can be released if determined to no longer be a danger to reoffend." Grado v. State , WD 79756, 2017 WL 4622132, at *4 (Mo. App. W.D. Oct. 17, 2017). The SVP commitment program is civil and governed by sufficient safeguards, including its release procedures. Id. "Similar programs have been found constitutional by the United States Supreme Court." Id. We do not find arguments presented in J.D.B.'s second point to be materially different from challenges previously raised and rejected by the Supreme Court of Missouri.
Conclusion to Point II
Based on the foregoing, we deny Point II.
c. Point III-The "Control" Component of the SVPA
In Point III, J.D.B. argues that the SVPA is unconstitutional, because it "permits a mental abnormality finding and commitment ... without a showing that the individual has serious difficulty controlling his predatory, sexually violent behavior." More specifically, J.D.B. argues the SVPA permits a finding of mental abnormality "based solely on emotional capacity," without considering an individual's "volitional capacity."
In Kansas v. Crane , 534 U.S. 407, 411-13, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002), the United States Supreme Court explained that due process requires "proof of serious difficulty controlling behavior" to "distinguish the dangerous sexual offender whose mental illness ... subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case." In Missouri, "a sexually violent predator is someone 'who suffers from a mental abnormality which makes the person more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility.' " Kirk , 520 S.W.3d at 454-55 (quoting § 632.480(5)). As used in the SVPA, "mental abnormality" means "a congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others." § 632.480(2).
*674 Based on these statutory definitions, J.D.B. argues the SVPA "is unconstitutional because it does not require proof of a serious difficulty controlling behavior." The Supreme Court of Missouri addressed this argument in Kirk and explained due process can be satisfied when the jury instruction references the defendant's difficulty controlling his behavior, even though "control" is not expressly required in the SVPA. Kirk , 520 S.W.3d at 451. The Court explained that the due process requirements referenced in Crane are satisfied when the jury instruction that defines mental abnormality ... reads as follows: "As used in this instruction, 'mental abnormality' means a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to commit sexually violent offenses in a degree that causes the individual serious difficulty in controlling his behavior." Id. (quoting In re Care & Treatment of Thomas , 74 S.W.3d 789, 792 (Mo. banc 2002) ). In the present case, Instruction No. 6 included identical language. Consequently, we deny Point III.
d. Point IV-J.D.B.'s Testimony to a Licensed Professional Counselor
In Point IV, J.D.B. argues "[t]he trial court erred in admitting testimony about privileged and confidential statements [J.D.B.] made to treatment providers ... in that witnesses testified about treatment-related statements contained [in] Exhibits 27, 31, and 33 since those statements were privileged under § 337.540."
Standard of Review-Admission of Evidence
In a similar case where the constitutionality of the SVPA was challenged, the Supreme Court of Missouri explained the standard of review with regards to admission of evidence:
The determination of whether to admit evidence is [generally] within the sound discretion of the trial court. A trial court will be found to have abused its discretion when a ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. This Court's direct appeal review is for prejudice, not mere error, and the trial court's decision will be reversed only if the error was so prejudicial that it deprived the defendant of a fair trial. Trial court error is not prejudicial unless there is a reasonable probability that the trial court's error affected the outcome of the trial.
Murrell v. State , 215 S.W.3d 96, 109-10 (Mo. banc 2007) (internal citations omitted). Thus, for J.D.B. to establish the trial court committed reversible error by admitting these exhibits, he must show (1) the trial court's abused its discretion in admitting the exhibits and (2) the erroneous admission was prejudicial. Id. The complaining party bears the burden of establishing prejudice. Fairbanks v. Weitzman , 13 S.W.3d 313, 321 (Mo. App. E.D. 2000).
Analysis of Point IV
J.D.B. challenges the admissibility of "treatment-related statements contained [in] Exhibits 27, 31, and 33," arguing the statements were privileged under § 337.540. Exhibit 27 provides a very brief, summarized timeline of events related to J.D.B.'s history relevant to the SVP proceedings. Exhibit 27 "contained information derived from records of [J.D.B.'s] treatment" with a licensed counselor, Rodney Clossum, LPC. Exhibits 31 and 33 are quarterly reports written by Clossum, which included his opinions on J.D.B.'s progress from October of 2011 through March of 2012. Section 337.540 generally defines when communications between a person and a licensed professional counselor *675 are considered privileged communications:
Any communication made by any person to a licensed professional counselor in the course of professional services rendered by the licensed professional counselor shall be deemed a privileged communication and the licensed professional counselor shall not be examined or be made to testify to any privileged communication without the prior consent of the person who received his professional services, except in violation of the criminal law.
The State contends that "[t]he legislature, aware of this privilege and others, drafted a provision in the SVPA that abrogated this privilege [by enacting § 632.510]." Section 632.510 reads:
In order to protect the public, relevant information and records which are otherwise confidential or privileged shall be released to the agency with jurisdiction or the attorney general for the purpose of meeting the notice requirement provided in section 632.483 or 632.484 and determining whether a person is or continues to be a sexually violent predator.
Whether the trial court properly interpreted and applied § 337.540 and § 632.510 is relevant to determining if the trial court erred. Nonetheless, to warrant reversal, J.D.B. bears the burden of establishing the trial court (1) committed an error and (2) said error was prejudicial. Murrell , 215 S.W.3d at 109-10. Here, because it is clear that admission of the exhibits cannot be deemed "prejudicial," we need not examine the interplay between §§ 337.540 and 632.510.
Virtually all of the information included in the exhibits was included in the testimony from Dr. Scott, J.D.B.'s father (witness for J.D.B.), Pastor Ingle, and J.D.B. himself. We cannot find, and J.D.B. has not directed us to, any piece of non-cumulative information that may have changed the result if it had been excluded. Exhibit 27 merely provided a one-page summary of events relevant to the SVP proceedings, such as when J.D.B. became aware of his sexual attraction to children, his two prior criminal offenses, his receipt of parole and its subsequent revocation, and the like. The quarterly progress reports (Exhibits 31 and 33) were similarly duplicative. The reports discussed his church attendance, his limited social circle and support system outside of his family, his difficulty in taking lessons from treatment and applying them in a practical manner, his troubles with being honest during counseling sessions, and the like.
Evidence that reiterates the same point is "cumulative." Martin v. Mercy Hosp. Springfield , 516 S.W.3d 403, 406 (Mo. App. S.D. 2017). "A complaining party is not entitled to assert prejudice if the challenged evidence is cumulative to other related admitted evidence." Id. (quoting Saint Louis Univ. v. Geary , 321 S.W.3d 282, 292 (Mo. banc 2009) ). J.D.B. is required to establish that there is a reasonable probability that the alleged erroneous admissions affected the outcome of the case. Fairbanks , 13 S.W.3d at 321 ; Murrell , 215 S.W.3d at 109-10. The three exhibits complained of, which consist of three pages in total, effectively reiterated what the jury heard from unchallenged admissible testimony. In fact, most of the content contained in the exhibits was discussed by multiple witnesses. Accordingly, we do not find exclusion of these exhibits would have created a reasonable probability of a different outcome. Murrell , 215 S.W.3d at 109-10. Thus, even if we had found the exhibits were erroneously admitted, the admissions would not constitute reversible error. Point denied.
e. Point V-Sufficiency of Evidence to Make a Submissible Case *676 In J.D.B.'s fifth point on appeal, he asserts that the trial court erred in denying his motion for a directed verdict and committing him as a SVP, because there was insufficient evidence to make a submissible case, as the evidence is insufficient to establish J.D.B. was "more likely than not" to commit predatory acts of sexual violence unless he was committed.
Standard of Review for Submissibility of a Case
In reviewing whether the trial court erred by denying a motion for a directed verdict in SVP proceedings, "we review to determine if the State made a submissible case." Bradshaw v. State , 375 S.W.3d 237, 242 (Mo. App. S.D. 2012). In making our assessment of the case's submissibility, we must view all evidence and reasonable inferences therefrom in the light most favorable to the State's case, while disregarding all contradictory evidence. Id. "To make a submissible case for SVP commitment, the evidence and the reasonable inferences therefrom, viewed in a light most favorable to the State's case, must establish each of the requisite elements of an SVP commitment." Id. In cases for SVP commitment, the State must adduce clear and convincing evidence from which a "trier of fact can reasonably decide the case." Id.
Analysis of Point V
J.D.B. was only entitled to a directed verdict in his favor if the State failed to make a submissible case. Id. To make a submissible case, the State bears the burden of proving by clear and convincing evidence that J.D.B.: "(1) has committed a sexually violent offense; (2) suffers from a mental abnormality; and (3) this mental abnormality 'makes the person more likely than not to engage in predatory acts of violence if not confined in a secure facility.' " Kirk , 520 S.W.3d at 448-49 (quoting § 632.480(5)). The parties stipulated to the fact that J.D.B. "ha[d] been convicted of First Degree Child Molestation and that it's a sexually violent offense." Thus, the State was required to adduce clear and convincing evidence to establish the second and third elements of § 632.480(5).
Element Two-Mental Abnormality
As used in the SVPA, "mental abnormality" means "a congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others." § 632.480(2). The Supreme Court of Missouri classifies "pedophilia" as a sexually deviant disorder that satisfies the statutory definition of "mental abnormality." Murrell , 215 S.W.3d at 107 ; see also Underwood v. State , 519 S.W.3d 861, 876 (Mo. App. W.D. 2017) (citing Murrell , 215 S.W.3d at 107 ) ("A pedophilia diagnosis alone satisfies the 'mental abnormality' standard.").
At trial, Dr. Scott's testimony provided sufficient evidence that J.D.B. suffered from pedophilia or "Pedophilic Disorder," as classified by the Diagnostic and Statistical Manual of Mental Disorders, Fifth Ed. ("DSM-5"). After reviewing thousands of pages of J.D.B.'s history and interviewing him for four hours, Dr. Scott diagnosed J.D.B. with Pedophilic Disorder as it is defined in DSM-5. Dr. Scott testified that the DSM-5 had been adopted by the Department of Mental Health in 2015. He further testified that the DSM-5 is a manual generally accepted in the field of Psychiatry and Psychology for the purposes of diagnosing an individual's mental condition. Dr. Scott's testimony was sufficient to establish that J.D.B. suffered from Pedophilic Disorder, which "alone satisfies the 'mental abnormality' standard" of *677 § 632.480(2). Underwood , 519 S.W.3d at 876.
Element 3-Likelihood of recommitting predatory acts of sexual violence
J.D.B. contends that the State failed to show he would more likely than not commit predatory acts of sexual violence unless he is committed. J.D.B. notes that Dr. Scott relied on three actuarial instruments in forming his opinion, and although they may help assess future risk of "sexual offending," they do not help capture "the statutorily required risk of [committing] 'predatory acts of sexual violence.' " (emphasis added).
Here, Dr. Scott provided great detail about why he concluded that J.D.B. is "more likely than not" to recommit predatory acts of sexual violence if not committed, as well as his bases for reaching an informed conclusion. For example, Dr. Scott testified that he reviewed thousands of pages of records related to J.D.B.'s history. Dr. Scott also noted that he interviewed J.D.B. for four hours on March 11, 2014. Moreover, Dr. Scott explained that he used three different risk-assessment instruments to aid him in reaching his ultimate conclusion: the Static 99, the Static 2002, and the Stable 2007. Dr. Scott testified that all three instruments are "generally relied on by professionals in [his] field ... in assessing a person's future risk for sexual offending." Dr. Scott explained that all three tests returned consistent results, placing J.D.B. in the "high risk" category of reoffending. He further explained the level of risk by stating J.D.B. was placed in the 94th percentile among sex offenders according to the Static 99 and in the 88th percentile among sex offenders based on the Static 2002.
Briefly, J.D.B. points out the actuarial instruments predicted there was approximately a 20.5 % chance of J.D.B. being rearrested or reconvicted within five years unless he was securely confined. However, J.D.B. does not challenge Dr. Scott's bases for concluding that number grossly underestimates the life-time potential risk of reoffending. Dr. Scott testified that reconviction and rearrest rates would continue to grow-albeit at a declining rate-after the initial 5-year period; for example, he estimated the average rate of reconviction or rearrest for someone with J.D.B.'s scores would increase to 30 % over the first 10-year period if he were not committed. Dr. Scott also explained that sex offenses are more likely to go unreported or unprosecuted than most offenses, which is especially true with "child victims." He noted that victims are less likely to come forward and report the offense. Additionally, Dr. Scott explained "sex offenses are hard to prosecute because of the consequence for the victim." Thus, Dr. Scott concluded that "sex offenses ultimately get convictions at a ... substantially lower rate than they occur," and the disparity is even greater when the victim is a child. Therefore, the facts that the instruments estimated a 20.5 % 5-year probability of reoffending and Dr. Scott predicted J.D.B. was "more likely than not" to recommit predatory acts of sexual violence were consistent, not contradictory.
J.D.B. also contends that these future risk assessments look solely at the risk of reoffending, while § 632.480 requires risk to be assessed in terms of predatory acts of sexual violence. "Predatory" means "acts directed towards individuals ... for the primary purpose of victimization." § 632.480(3). Missouri appellate courts have found that there must be evidence that the individual in question is more likely than not to commit predatory acts of sexual violence, and the submissibility of the case hinges on this predatory component. In re Care & Treatment of Morgan v. State , 176 S.W.3d 200, 211 (Mo. App. W.D. 2005) ;
*678 In re Care & Treatment of Cokes , 107 S.W.3d 317, 324 (Mo. App. W.D. 2003). J.D.B. relies on Morgan and Cokes to buttress his position. However, as the State points out, the Western District heard and disposed of a similar argument earlier this year in In Matter of Care & Treatment of George v. State , 515 S.W.3d 791 (Mo. App. W.D. 2017).
In Cokes , Dr. Mandracchia-the psychologist who provided expert testimony for the State-testified about the likelihood of Cokes reoffending. Cokes , 107 S.W.3d at 322. However, Dr. Mandracchia only opined about the risk of Cokes sexually reoffending without any reference to the reoffending being predatory. Id. For example, Dr. Mandracchia ultimately gave the following testimony in Cokes :
Q. Did you try to make a determination as a result of this mental abnormality and looking at your actuarial measures, did you try to determine whether or not it was more likely than not Mr. Cokes would sexually reoffend?
A. Yes, I did.
Q. What is your determination?
A. I determined that in terms of probability it is more likely than not that he will reoffend.
Id. Cokes argued that Dr. Mandracchia's testimony was "insufficient to support a determination that [he] was likely to 'reoffend in a predatory and violent way.' " Id. at 323. The court agreed, stating that Dr. Mandracchia "never rendered an opinion to that effect." Id. Accordingly, the court found the State did not make a submissible case and the cause must be remanded for a new trial. Id. at 324, 327.
Dr. Mandracchia also provided testimony for the State in George ; however, unlike in Cokes , his testimony was found to be sufficient to make a submissible case there. George , 515 S.W.3d at 800-01. The court found Dr. Mandracchia's testimony in George was distinguishable from his testimony in Cokes , stating:
Here, Dr. Mandracchia, relying on George's records and actuarial tools, testified that George had a mental abnormality that "[w]ould render him having serious difficulty controlling his behavior and being more likely than not to reoffend if not in a controlled environment." And "by reoffend," Dr. Mandracchia testified that he "mean[t] committing a predatory act of sexual violence." This is precisely the testimony and evidence that, in Cokes, this court said would be sufficient to make a submissible case that an offender is an SVP .
Id. at 800 (emphasis added).
In the case at bar, Dr. Scott provided similar testimony to what Dr. Mandracchia gave in George . Dr. Scott explained that Missouri law defines "sexually violent predator" as "any person who suffers from a mental abnormality, which makes the person more likely than not to engage in predatory acts of sexual violence, if not confined in a secure facility ..." (emphasis added). Dr. Scott testified that in forming his opinion, first he had to decide that J.D.B. had a "mental abnormality," and then he had "to decide whether the person is more likely than not to commit predatory acts of sexual violence if not confined because of that mental disorder." (emphasis added). Ultimately, Dr. Scott stated that, "within a reasonable degree of psychological certainty," it was "[his] opinion that as a result of [J.D.B.'s] mental abnormality, he is more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility." (emphasis added). Like the Western District found in George , the expert testimony provided in J.D.B.'s case was sufficient to support a finding that J.D.B. was more likely than not to commit predatory acts of sexual violence unless he was confined in a secure facility.
*679 J.D.B. also contends that Morgan supports reversal. This is unconvincing. In Morgan , "the State had stipulated and agreed to the use of the prior ... definition of predatory act to be used in the verdict director." George , 515 S.W.3d at 800 (quoting Morgan , 176 S.W.3d at 207 ). Under a prior definition of "predatory acts"-found in § 632.480(3), RSMo 1999-"it was not enough that the act was for the primary purpose of victimization." Id. (quoting Morgan , 176 S.W.3d at 207 ). Under the § 632.480, RSMo 1999, the State had the burden of providing evidence that the individual at issue "was more likely than not to engage in acts directed towards strangers or individuals with whom relationships had been established or promoted for the primary purpose of victimization." Id. (quoting Morgan , 176 S.W.3d at 206 ). The Western District explained this heightened burden under § 632.480, RSMo 1999:
In Morgan , "the State did not produce any evidence from which it could be reasonably inferred by the jury that, after the initial relationships were established with the victims, the appellant targeted them for victimization by intentionally cultivating close, trusting relationships with them," and therefore failed to meet its burden to prove that the appellant was more likely than not to engage in predatory acts of sexual violence under the applicable definition.
Id. (quoting Morgan , 176 S.W.3d at 206 ). As the Western District noted in George , "the higher standard that the State stipulated to in Morgan is inapplicable" under the current standard established by § 632.480. Id. at 801 (quoting Morgan , 176 S.W.3d at 206 ). Morgan is especially unpersuasive, because "whether the State made a submissible case [in Morgan ] ultimately turned on which version of the definition of 'predatory act' was used." Id. at 801 (quoting Morgan , 176 S.W.3d at 207 ). The George court explained "there was no question" that the State would have made a submissible case under the current definition of "predatory" under § 632.480(3). Id.
Turning to another recently decided case, the Supreme Court of Missouri addressed a comparable sufficiency of evidence argument, where the State relied on similar testimony. Nelson , 521 S.W.3d at 233. Like the case at bar, Nelson argued that "the state failed to prove he was more likely than not to commit predatory acts of sexual violence if not confined, as required by section 632.480(5)." Id. In Nelson , the Court noted that two experts opined that Nelson was "more likely than not" to commit future predatory acts of sexual violence unless he was securely confined. Id. In support of these conclusions, the experts "testified extensively regarding the bases for their opinions," and there was "more than sufficient evidence for the jury to find the criteria in section 632.480(5) were met." Id. at 234. Accordingly, the State had made a submissible case.
In the present case, Dr. Scott also provided extensive testimony explaining the bases for his opinion. Dr. Scott testified that it was "[his] opinion that as a result of [J.D.B.'s] mental abnormality, he is more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility," and he arrived at that conclusion "within a reasonable degree of psychological certainty." Multiple times throughout his testimony, Dr. Scott explained that he concluded J.D.B. suffered from a mental abnormality (Pedophilic Disorder), and as a result of his mental abnormality, it was more likely than not that J.D.B. would commit predatory acts of sexual violence if he was not confined to a secure facility.
The jury was also presented with the opportunity to further evaluate J.D.B. when he took the stand. Throughout *680 J.D.B.'s testimony, he expressed that unfulfilled emotional and physical needs triggered his behaviors of viewing child pornography and offending against K.W. He also explained that certain "lifestyle risk factors" contributed to his offending, such as his difficulty in having healthy relationships or holding a job. He also testified that while he was in relationships with women, his interest in child pornography diminished; for example, during a one-year relationship with a woman in the early 2000's, he testified he did not view pornography at all. At the time of that relationship, he had been living in Iowa and not offending against any children. Upon deciding he wanted to end the relationship with the woman, he moved back to Missouri. After he returned, he began to reoffend against K.W. and use child pornography again. On cross-examination, J.D.B. conceded that if he was not committed, he would have a difficult time getting a job, establishing an intimate relationship with an adult, and having his emotional needs met in general because of his status as a convicted sex offender. J.D.B. further acknowledged that these issues were why he "continued to turn to [both child and adult] pornography even when [he] was out on parole [.]" J.D.B.'s own testimony could further support a reasonable jury's determination that he would be more likely than not to reoffend against a child if not committed to a confined facility. When assessing a sufficiency of the evidence challenge, we disregard conflicting evidence and inferences. Keveney v. Missouri Military Acad. , 304 S.W.3d 98, 104 (Mo. banc 2010). "The jury is the sole judge of the credibility of witnesses," and it is free to believe or disbelieve any, all, or none of a witness's testimony. Id. at 105.
Viewing the evidence in the light most favorable to the judgment, we find there was clear and convincing evidence sufficient for a reasonable jury to have found every necessary element for commitment in a SVP case. Thus, the State made a submissible case, and the trial court did not err in denying J.D.B.'s motion for a directed verdict. Point V is denied.
f. Point VI-No Instructional Error
In J.D.B.'s final point on appeal, he argues that giving Instruction No. 7 to the jury violated his rights to due process and a fair trial because it prejudiced him and it was irrelevant to the ultimate issue. Instruction No. 7 read: "If you find Respondent to be a sexually violent predator, the Respondent shall be committed to the custody of the director of the department of mental health for control, care and treatment." Specifically, J.D.B. contends that the use of the word "treatment" was an "external constraint."
Standard of Review for Alleged Instructional Error
Whether an instruction was properly submitted to the jury is a question of law, which we review de novo. Templemire v. W & M Welding, Inc. , 433 S.W.3d 371, 376 (Mo. banc 2014), as modified (May 27, 2014). "To reverse a jury verdict on the ground of instructional error, the party challenging the instruction must show that: (1) the instruction as submitted misled, misdirected, or confused the jury; and (2) prejudice resulted from the instruction." Fleshner v. Pepose Vision Inst., P.C. , 304 S.W.3d 81, 90-91 (Mo. banc 2010).
Analysis of Point VI
Currently, SVP cases do not have specific, applicable Missouri approved instructions. In re Gormon , 371 S.W.3d 100, 106 (Mo. App. E.D. 2012). When particular instructions do not exist, Missouri Supreme Court Rule 70.02 requires that the instruction "be simple, brief, impartial, and free from argument." Kirk , 520 S.W.3d at 456. Additionally, we review the instruction *681 to assess whether the jury could understand the instruction and "whether the instruction follows applicable substantive law by submitting the ultimate facts required to sustain a verdict." Id. (quoting Doe 1631 v. Quest Diagnostics, Inc., 395 S.W.3d 8, 13 (Mo. banc 2013) ).
Essentially, Instruction No. 7 mirrored the language of § 632.492, which states that if a jury trial is held in a SVP case, "the judge shall instruct the jury that if it finds that the person is a sexually violent predator, the person shall be committed to the custody of the director of the department of mental health for control, care and treatment ." § 632.492 (emphasis added). The trial court acted properly by mirroring the language from the SVPA. Gormon , 371 S.W.3d at 106. Further, although explaining what occurs upon commitment is not significant to the jury's resolution of whether J.D.B. qualifies as a "sexually violent predator" under 632.480(5), we do not find inclusion of the word "treatment" to be misleading, distracting, or prejudicial. Point VI is denied.
V. Conclusion
Based on the foregoing, the trial court's judgment is affirmed.
Mary K. Hoff, J., concurs.
Lisa S. Van Amburg, J., concurs.

All statutory references are to RSMo 2000 as updated through the most recent applicable cumulative supplement, unless otherwise indicated.

Dr. Scott noted that the "Static items were historical or demographic [variables], things that have happened before that we can't change, and then qualities of the person and their relationship, like marriage." However, the Stable 2007 "is about changeable things; attitudes, emotions, sexual deviance diagnoses, relationships in terms of negative influences, a variety of variables like that."

Under Point II, J.D.B. restates a summarized version of his "burden of proof" argument from Point I. For the same reasons noted in the analysis of Point I, we do not find the "clear and convincing" standard to be unconstitutional.

Missouri's equal protection clause is "coextensive" with the equal protection clause in the Fourteenth Amendment. Bernat v. State , 194 S.W.3d 863, 867 (Mo. banc 2006).

Before Kirk was handed down, the Western District rejected a nearly identical argument for the same reasons. Matter of Brown v. State , 519 S.W.3d 848, 855 (Mo. App. W.D. 2017) (citing Norton , 123 S.W.3d at 174 ).

J.D.B. contends that the right to silence "applied to [him] when [he was] faced with the adversarial system and SVP evaluation by [someone], who worked for the State and was not acting in his interest when conducting a Chapter 632 evaluation while [J.B.D.] was in DOC custody." J.D.B. cites Miranda v. Arizona , 384 U.S. 436, 467, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) to support his contention. Nonetheless, he fails to explain how Miranda applied here. Consistent with our prior explanation that SVP proceedings cannot be characterized as "criminal" or "punitive" proceedings, Miranda is inapplicable here. See Kirk, 520 S.W.3d at 450 (explaining that "the SVPA evidences no punitive intent ... [and] SVPA proceedings ... are civil proceedings").